Katie Ellen WEST, et al., Plaintiffs,

v.

William C. COSTEN, et al., Defendants.

Civ. A. No. 79–0210–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

March 2, 1983.

Henry L. Woodward, Roanoke, Va., for plaintiffs.

Raymond R. Robrecht, Salem, Va., for defendants.

## OPINION and INTERLOCUTORY SUMMARY JUDGMENT

TURK, Chief Judge.

Plaintiffs bring this class action alleging that the defendants, William C. Costen (Costen), Multi-Service Factors, Inc. (MSF), Deborah J. Kirksey (Kirksey), Janet Lee (Lee), and Virginia M. Price (Price), have violated the Fair Debt Collection Practices Act (FDCPA or the Act), 15 U.S.C. § 1692 *et seq.* The court has jurisdiction under 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331. The action is before the court on the plaintiffs' motion for partial summary judgment on the issues of liability and on the defendants' motion for summary judgment. *See* Fed.R.Civ.P. 56(c).

### 1. The FDCPA

In 1977 Congress enacted the FDCPA in response to national concern over "the use of abusive, deceptive and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The purpose of the FDCPA is "to protect consumers from a host of unfair, harassing, and deceptive debt collection practices without imposing unnecessary restrictions on ethical debt collectors." S.Rep. No. 382, 95th Cong., 1st Sess. 1–2, *reprinted in* 1977 U.S.Code Cong. & Ad.News 1695, 1696.

The FDCPA sets forth a nonexclusive list of unlawful debt collection practices. Although it does provide for public enforcement by the Federal Trade Commission (FTC), *see* 15 U.S.C. § 1692*l*, it is "primarily self-enforcing," S.Rep. No. 382, *supra* at 5, 1977 U.S.Code Cong. & Ad.News at 1699, through private causes of action. Individu-

al consumers may recover actual damages and a civil penalty up to $1,000 for violations of the Act. 15 U.S.C. § 1692k(a). In the case of a class action, each named plaintiff may recover the above amounts and all other class members may recover up to the lesser of 1% of the collector's net worth or $500,000. *Id.* Attorney fees may also be awarded if the consumer proves a violation of the FDCPA. *Id.*

### 2. Procedural History

On August 15, 1979, six individual plaintiffs (West, Walker, Jackson, Dawson, Spangler, and Preston) filed this suit as a class action under the FDCPA seeking actual and statutory damages for themselves and their class and subclass for an alleged pattern of illegal collection practices by the defendants.

With the exception of Costen, the defendants moved to dismiss for lack of jurisdiction and to deny class certification. By order entered September 24, 1979, the court denied the motion to dismiss and declined to pass upon the class motion. A joint answer was filed for all defendants.

Plaintiffs then moved for class certification and for a preliminary injunction prohibiting the defendants from using certain collection practices. After an evidentiary hearing, supplemented by affidavits, the court on January 17, 1980, entered an order finding for purposes of injunctive relief only a continuing pattern of practices prohibited by the FDCPA, certifying a class for purposes of injunctive relief only, and enjoining the defendants from violating various provisions of the Act.

The parties thereafter completed depositions and other discovery, except with regard to defendant Lee who failed to appear for her deposition. In May 1980, plaintiffs moved to intervene Thennie V. Dent (Dent) as an additional named plaintiff. In July 1980, all defendants moved to deny certification of a class for damages, and Costen moved for summary judgment in his favor on the basis that he is not a "debt collector" within the meaning of the FDCPA. *See* 15 U.S.C. § 1692a(6). The court took Costen's motion under advisement at a hearing on July 23, 1980.

On September 29, 1980, plaintiffs renewed their motion for class certification for damages and moved for partial summary judgment as to the liability of the defendants.

On January 26, 1981, counsel for the defendants moved for, and was granted, leave to withdraw as counsel. Although given 30 days to retain new counsel in addition to being given notice of a hearing on March 2, 1981, on plaintiffs' motions, the defendants did not appear either in person or by counsel at the March 2 hearing.

On March 6, 1981, the court entered an order permitting Dent to intervene as a named plaintiff in this action. The court's March 6 order also certified this action, as to MSF and Costen only, as a class action for damages pursuant to Fed.R.Civ.P. 23(b)(3). The order recites that the court found that MSF and Costen had engaged in a pattern of collection practices which plaintiffs alleged violate the FDCPA. A class was certified consisting of all persons from whom the defendants had collected or attempted to collect a debt since August 15, 1978. In addition, a subclass was certified consisting of all persons from whom the defendants had collected any charges other than the amounts owed as debts of those persons since August 15, 1978. The class certification for damages was conditional upon plaintiffs providing to the court a plan for adequate notice to class members and for management of further proceedings as a class action. The court reserved decision on plaintiffs' motion for partial summary judgment.

The defendants retained new counsel later in March 1981. Then, on April 23, 1981, the defendants moved to set aside the court's March 6 order. By order entered June 23, 1981, the court denied defendants' April 23 motion.

Meanwhile, on May 4, 1981, Costen filed a voluntary petition in bankruptcy under Chapter 13. On July 1, 1981, Costen filed an application for removal of this action from this court to the United States Bank-

ruptcy Court for the Western District of Virginia. On July 21, 1981, this action was transferred to the bankruptcy court. But on August 11, 1982, the bankruptcy court returned this action to this court because of the question of its jurisdiction in light of the holding in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* ——— U.S. ———, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982). By order entered August 12, 1982, this action was reinstated on the docket of this court.

Over defendants' objection, on October 12, 1982, the court granted plaintiffs' motion to supplement the notice previously given to the class and subclass certified in this action. The published supplemental notice provided that class members who did not opt out by November 1, 1982, would be included in the court's ruling on the merits of this action.

The court heard argument on plaintiffs' motion for partial summary judgment and defendants' motion for summary judgment on November 24, 1982.

### 3. Factual Background

The plaintiffs are all natural persons who were living in or near Roanoke at the time of their dealings with the defendants. Except for Spangler, the plaintiffs either owed, or at one time owed, the debts which the defendants attempted to collect for various creditors. Plaintiff-intervenor Dent denies owing the debt on which collection was attempted from her and her son. The defendants' collection attempts which are the subject of the case *sub judice* all occurred between September, 1978 and January, 1980.

MSF was a Pennsylvania corporation which was licensed to do business in Virginia.[1] Costen was the president of MSF. His job was to obtain new accounts from merchants and retailers. Costen dep. 30. As part of his compensation, Costen received ten percent of the amount that MSF earned from the accounts that he personally sold. *Id.* at 30–31. Jeffrey P. Johnson was the

vice president and secretary of MSF. Karen Mayberry was MSF's treasurer. These same individuals also served as directors of the corporation.

MSF's individual collection agents were paid on a commission basis only; they received no salary. *Id.* at 44. Robert Shisler, MSF's office manager, was responsible for recruiting and training new collection agents, as well as for setting and computing their commissions. *Id.* at 44, 46, 58. MSF apparently had no formal training for its "commissioned collection agents," however. Kirksey dep. 55; Price dep. 22, 49–50; Jackson dep. 21–22. Instead, they learned their collection methods on an informal basis from other individual collectors. Price dep. 22, 28. But MSF's collection agents were told that they must comply with the FDCPA, Costen dep. 58–59; Kirksey dep. 55, 84; Price dep. 45, 50, and FTC rules concerning debt collection practices were posted on the office walls where they worked. Kirksey dep. 59, 84; Price dep. 22.

Most of the debts that MSF attempted to collect were dishonored checks. After MSF obtained an account, the creditor would deliver the bad checks to the corporation. A work card was then prepared from each check. Costen dep. 52. A carbon copy of the work card was kept in a master file and the hard copy was distributed to the individual collectors. *Id.* However, prior to the individual collectors taking any action themselves, a secretary would send the debtors a letter advising them that they had a check outstanding, who it was to, and the amount. Kirksey dep. 85. If the debtor did not respond to the initial letter within two weeks, the individual collectors would then attempt collections. *Id.* at 85–86. The individual collectors would first mail printed forms demanding payment by a specified time. Then, if the forms did not work, they would make telephone calls to the debtors. MSF's collection agents sometimes made personal visits to the debtor's residence. All collection efforts were to be

---

1. MSF continued to do business for sometime after the court granted plaintiffs a preliminary injunction on January 17, 1980. During argument on November 24, 1982, however, counsel for the parties represented to the court that MSF had ceased doing business.

noted on the hard copy of the work card. If a check was paid, it would be returned to the client, along with the amount of the check less MSF's commission, and the work card destroyed. Costen dep. 52. If the check could not be collected, it would be returned to the creditor and the work card destroyed. *Id.* at 52–53.

MSF would receive between thirty and fifty percent of the amount of the check collected for its client. Costen dep. 75–76. The person who sold the account, usually Costen, would receive ten percent of MSF's share, *Id.* at 31, and the individual collector would receive twenty percent. Furthermore, as a standard practice, MSF always attempted to collect a $15 service charge on each bad check, regardless of the amount of the check. *Id.* at 32, Kirksey dep. 72; Price dep. 34–35; Costen's answer to interrog. no. 12. If the $15 service charge was collected in full, the individual collector received $7; the person who garnered the account (usually Costen) received $.75; the office manager received $1; and the balance would go to MSF for general operating expenses. Costen dep. 75.

### 4. The Parties' Contentions

The named plaintiffs allege that they have suffered extreme emotional distress, embarrassment, and humiliation as the results of the defendants' collection efforts. They contend that the defendants violated the FDCPA by: (1) communicating with third parties concerning the collection of debts in violation of 15 U.S.C. § 1692c(b); (2) threatening that criminal prosecution was pending or that warrants were to be issued when such was not intended or could not be done legally in violation of 15 U.S.C. § 1692e(4) and (5); (3) failing to comply with the notice and validation of debt procedures required by 15 U.S.C. § 1692g(a); (4) collecting service charges not expressly authorized by the agreement creating the debt or permitted by law in violation of 15 U.S.C. § 1692f(1); and (5) misrepresenting the amount of the debt owed and the legality of receiving service charges as compensation for collecting debts in violation of 15 U.S.C. § 1692e(2)(A) and (B).

As relief, West seeks actual damages of $1,000 and statutory damages of $1,000 from Kirksey, MSF, and Costen. Walker seeks $2,000 in actual and statutory damages from Lee, MSF, and Costen, as well as damages equal to the service charges she paid to defendants. Jackson and Preston each seek $2,000 in actual and statutory damages from Price, MSF, and Costen. In addition, Jackson seeks damages equal to the service charges she paid to defendants. Dawson and Spangler each seek $500 in actual damages and $1,000 in statutory damages from MSF and Costen. Dent likewise seeks $2,000 in actual and statutory damages from MSF and Costen.

All members of the class seek $500,000 damages from MSF and Costen for an alleged pattern of violations of the *supra* provisions. The subclass alleges that MSF and Costen have systematically violated their rights under 15 U.S.C. § 1692f(1) by collecting service charges not expressly authorized by the agreement creating the debt or permitted by law. The subclass seeks damages from MSF and Costen equal to the service charges paid to MSF. In addition, all plaintiffs request judgment against all defendants jointly and severally for attorney's fees and costs.

In opposition to plaintiffs' motion for partial summary judgment, all the defendants assert that there are genuine factual issues which preclude an interlocutory summary judgment on the claims of third party contacts, threats of criminal prosecution and failure to give notice and validation of debts. In addition, the defendants move for summary judgment on the issue of liability for alleged unauthorized service charges on the grounds that such charges are not prohibited by Virginia law. Finally, Costen moves for summary judgment in his favor on the grounds that he is not a debt collector within the meaning of the FDCPA and that the facts of this case do not legally justify piercing the corporate veil to hold him individually liable.

### 5. Class Certification

Assuming that the prerequisites of Fed.R.Civ.P. 23(a) are met, a class action

may be maintained under Fed.R.Civ.P. 23(b)(3) if questions of law and fact common to the members of the class predominate over questions affecting individual class members, and the class action is superior to other means of litigation in terms of fairness and efficiency. *Abed v. A.H. Robins Company,* 693 F.2d 847, 855 (9th Cir. 1982). The court's order entered March 6, 1981, certified this action, as to MSF and Costen only, as a class action pursuant to Fed.R.Civ.P. 23(b)(3). The action was certified as a class action with regard to all of the plaintiffs' claims. However, in working through the motions now before the court, the court has concluded that some of the plaintiffs' claims will require the separate adjudication of each individual class member's allegations in order to determine MSF's liability to the class. Specifically, the court now finds that the third party contact and threat of arrest claims involve more individual issues than common ones. That individual issues of liability predominate over common ones is illustrated by the disposition *infra* of these claims as asserted by the named plaintiffs; partial summary judgment is granted in favor of some named plaintiffs and denied as to others. Thus, with respect to these claims, no single set of operative facts applies to each potential class member so that MSF's liability, if any, can be established as to all class members for a pattern of illegal collection practices. Instead, MSF's liability to the class members for third party contacts and threats of arrest cannot be proved unless each individual class member proves the necessary operative facts. For example, liability for threats of arrest may depend on whether each class member's creditor actually intended to have the class member arrested. Similarly, liability for third party contacts can be found only if MSF's collection agents spoke with third parties about each class member's alleged debt rather than location information. By comparison, MSF can be held liable to all class members under section 1692(a) if the undisputed facts show that MSF routinely failed to send the required written notice. Thus, because individual rather than common issues predominate with regard to the third party contact and threat of arrest claims, "the economy and efficiency of class action treatment are lost and the need for judicial supervision and the risk of confusion are magnified." 7A C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1778 at 55–56 (1972). Accordingly, the court decertifies the class as to these claims.

Nevertheless, even though common questions do not predominate relative to the third party contact and threat of arrest claims, this action can proceed on an individual basis with respect to these claims. In addition, the plaintiffs' other claims can be determined on a representative basis. *See* Fed.R.Civ.P. 23(c)(4)(A). Therefore, this action will proceed as a class action as to the claims of failure to give notice and unlawful service charge practices only. The remaining claims will be treated as individual claims by the named plaintiffs only.

### 6. Principles of Liability

 Liability under the FDCPA is possible only if a defendant is a "debt collector" within the meaning of the Act. Subject to numerous exceptions not relevant here, the FDCPA defines a "debt collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, *directly or indirectly,* debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6) (emphasis added). MSF is clearly a "debt collector" within the meaning of the Act because it is a "person" who uses the telephones and mails in the business of collecting debts owed or due or asserted to be owed or due another. As a corporation can act only through its agents, MSF may be held liable for the violations of its collection agents.[2]

**2.** Regardless of the Act's expansive definition of a "debt collector," MSF also can be held liable for the intentional acts of its agents un-

der the theory of vicarious liability. *See Broaddus v. Standard Drug Co.,* 211 Va. 645, 179 S.E.2d 497, 503–04 (1971). Although the em-

Kirksey, Lee, and Price are also "debt collectors" under the FDCPA because they regularly collected or attempted to collect directly debts owed or due or asserted to be owed or due another. Thus, these individual debt collectors can also be held liable for violating the provisions of the FDCPA.

### 7. Summary Judgment

■ A motion for summary judgment under Fed.R.Civ.P. 56 is designed to pierce the allegations in the pleadings and determine whether there are any factual issues that need to be tried. 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2712 (1983). Summary judgment shall be rendered for the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not a substitute for trial of disputed facts, however.

■ A party who moves for summary judgment bears the burden of showing both the absence of a genuine issue of fact and that judgment is warranted as a matter of law. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Phoenix Savings & Loan, Inc. v. Aetna Casualty & Surety Co.,* 381 F.2d 245 (4th Cir. 1967). And the court must draw inferences most favorable to the party opposing the motion when deciding whether this showing has been made from the documentary materials before it. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Furthermore, the opposing party is entitled to be given the benefit of all favorable legal theories invoked by the evi-

dence so considered. *Charbonnages de France v. Smith,* 597 F.2d 406 (4th Cir. 1979). Thus, summary judgment is inappropriate if there is any genuine factual issue or if there is any dispute over the reasonable inferences drawn from the undisputed facts in the record. *Morrison v. Nissan Motor Co., Ltd.,* 601 F.2d 139 (4th Cir.1979).

■ To sum up, the rule in this circuit, as so aptly stated by Chief Judge Parker, is that summary judgment

> should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law. And this is true even where there is no dispute as to the evidentiary facts in the case but only as to the conclusions to be drawn therefrom.

*Stevens v. Howard D. Johnson Co.,* 181 F.2d 390, 394 (4th Cir.1950) (citations omitted).

■ Despite this stringent burden, once a properly supported motion for summary judgment is made,

> an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Fed.R.Civ.P. 56(e). Thus, the burden of the adverse party to show the existence of a factual dispute is not fulfilled merely by asserting that a genuine issue exist for trial. *Chitwood v. Feaster,* 54 F.R.D. 204 (N.D.W.Va.), *vacated on other grounds,* 468 F.2d 359 (4th Cir.1972). Of course, the moving parties' affidavits may be "opposed

ployment agreement between MSF and the individual collectors refers to the latter as "independent contractors," the key consideration in determining the existence of a master-servant relationship is the alleged master's power of control of the alleged servant's actions. *Stover v. Ratliff,* 221 Va. 509, 272 S.E.2d 40, 42 (1980). Analyzed in this manner, Kirksey, Lee, Price, and its other individual collectors were agents of MSF for purposes of *respondeat superior* despite the designation of their status as "inde-

pendent contractors." That MSF exercised control over the individual collectors is shown by an intra-office memorandum dated December 19, 1979, from Manager Shisler to all MSF personnel which directs that no reference may be made to pending criminal warrants and that any violation of this directive will be grounds for immediate termination. Defendants' answer to request for production of documents ex. 3.

by depositions, answers to interrogatories, or further affidavits." Fed.R.Civ.P. 56(e). Furthermore, when deciding whether summary judgment is appropriate, the court may discover specific factual disputes that have not been asserted by either party.

Fed.R.Civ.P. 56(a) and (b) authorize either party to move for summary judgment in his favor "upon all or any part" of a claim by a claimant or a defending party. *See* 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil 2d* § 2736 (1983). Thus, summary judgment may be granted as to one or more claims and denied as to others. In addition, the last sentence of Rule 56(c) provides: "A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages." If an interlocutory summary judgment is appropriate, the case will proceed to trial for a determination of damages. *Id.*

In this action, the plaintiffs allege that the defendants have violated five sections of the FDCPA. All of the named plaintiffs, as well as the class and subclass members, seek to impose liability on MSF and Costen. In addition, individual claims are asserted directly against Kirksey by West, Lee by Walker, and Price by Jackson and Preston. In ruling on the parties' motions, all allegations of identical violations will be combined together in separate sections to determine the liability, if any, of all the defendants, except Costen, to all the named plaintiffs and class and subclass members. The court will turn last to the question of Costen's liability.[3]

### 8. Third Party Contacts

Like other sections of the FDCPA, its prohibition against certain third party contacts by debt collectors is designed to protect a consumer's[4] reputation and privacy, as well as to prevent loss of jobs resulting from a debt collector's communication with a consumer's employer concerning the collection of a debt. *See* S.Rep. No. 382, *supra* at 4, 1977 U.S.Code Cong. & Ad.News at 1699; 15 U.S.C. § 1692a. Section 1692c(b) provides:

> Except as provided in section 804,[5] without the prior consent of the consumer given directly to the debt collector, or the express permission of a court of competent jurisdiction, or as reasonably necessary to effectuate a post judgment remedy, a debt collector may not communicate, in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector.

**3.** There is no allegation or evidence that Costen personally attempted to collect any debts from any of the plaintiffs. But Costen was the president of MSF, as well as its dominant shareholder. Consequently, partial summary judgment can be granted against Costen only if the undisputed facts show that, as a matter of law, (1) he is a "debt collector;" (2) MSF is liable for violations of the FDCPA; and (3) MSF's corporate veil should be pierced and liability for its statutory violations imposed upon its dominant shareholder. Thus, resolution of the cross-motions concerning Costen's liability involves consideration of many issues unrelated to the questions of the liability of the other defendants and, therefore, the issue of Costen's liability will be considered separately.

**4.** Except as provided in 15 U.S.C. § 1692c(d), the term "consumer" is used in the FDCPA to mean any natural person obligated or allegedly obligated to pay any debt. 15 U.S.C. § 1692a(3).

**5.** Section 804 of the FDCPA, 15 U.S.C. § 1692b, places strict limits on the debt collector's acquisition of "location information" (i.e., address, telephone number, place of employment) regarding the consumer from whom the debt collection is being attempted. In seeking location information from any person other than the consumer, the debt collector must identify himself, state only that he is confirming or correcting location information, and identify his employer only if expressly requested. Among other things, the debt collector is prohibited from stating that the consumer owes any debt; communicating by post card or by any envelope that would indicate to the reader the nature of the debt collector's business or that the debt collector is attempting to collect a debt; and communicating with a third person more than once unless requested to do so by such person or to correct or complete previously obtained information.

(footnote added). For the purpose of this section only, the FDCPA defines the term "consumer" to include "the consumer's spouse, parent (if the consumer is a minor), guardian, executor, or administrator." 15 U.S.C. § 1692c(d). Thus, partial summary judgment may be granted against a debt collector for third party contacts if the undisputed facts show that the debt collector, without the consumer's consent or court permission, communicated with third parties, (not including the consumer's spouse, attorney, or parents if the consumer was a minor), about the debt.

█ West alleges that on July 2, 1979, Kirksey came to her house and, in the presence of a third party, threatened to have an arrest warrant issued unless West made payments on her debts. West later admitted, however, that another woman, not Kirksey, talked with her about her debts in the presence of a third party, Pat Cundiff. West dep. 23. In addition, Kirksey did call Cundiff more than once in attempting to contact West. West affidavit ¶ 4. But the record is unclear concerning Kirksey's reasons for contacting Cundiff more than once; thus, the court is unable to conclude that Kirksey violated section 1692c(b) by failing to comply with section 1692b(3). *See* footnote 5 and accompanying text *supra.* Moreover, Kirksey testified that she would seek location information only when she talked with someone other than the consumer; she would not discuss the debt. Kirksey dep. 71–72. Consequently, partial summary judgment is denied as to the liability of Kirksey and MSF to West for third party contacts.

█ Concerning Walker's third party contact claim, on November 11, 1978, Lee spoke with Walker's grandparents and uncle about Walker's debt. Walker affidavit ¶¶ 1–2. There is no evidence in the record to dispute this. Consequently, partial summary judgment is granted in favor of Walker as to the liability of Lee and MSF for unlawful third party contacts.

█ Jackson and Preston both allege that Price spoke to their families about their debts and made threats of criminal prosecution. Jackson stated that on December 4, 1978, Price told Jackson's sister about the debts, and that on "several occasions," Price attempted to persuade members of Jackson's family to make payments by telling them that Jackson would be imprisoned unless the payments were made. Jackson affidavit ¶ 2; Jackson dep. 16–17. Preston testified that Price told Preston's wife that an arrest warrant would be issued if he did not pay his debts. Preston dep. 68. Preston was not aware of any communication between Price and anyone other than Preston's wife about the debts, however. *Id.* at 71.

Price testified that she did not recall talking with Jackson's mother about anything except trying to locate Jackson. Price dep. 6–7. She admitted, however, that she may have talked with a consumer's parents about the debt if they brought it up first. *Id.* at 48. In light of this testimony and the specific facts in Jackson's affidavit and deposition, the court finds that it is undisputed that Price, without Jackson's consent, spoke with third parties about Jackson's debt. Accordingly, partial summary judgment is granted in favor of Jackson and against Price and MSF for unlawful third party contacts.

█ However, it is undisputed that the only person other than Preston with whom Price spoke about Preston's debts was Preston's wife. Under section 1692c(d), the consumer's spouse is not a third party for the purpose of section 1692c(b). Accordingly, plaintiffs' motion for partial summary judgment is denied as to Jackson's third party contact claim, and summary judgment is granted in favor of Price and MSF as to Preston's third party contact claim.

█ As to Dawson's third party contact claim, Dawson's sworn statement that a MSF collection agent named Childress left a payment demand notice with Dawson's teenage daughter and spoke to her about the debt, Dawson affidavit ¶ 3, ex. A; Dawson dep. 94, is undisputed. Accordingly, Dawson is granted partial summary judgment as to the liability of MSF for unlawful third party contacts.

Turning now to Spangler's third party contact claim against MSF, the facts contained in Spangler's affidavit and deposition show that no one asserted that she was obligated to pay any debt or attempted to collect any debt from her. Rather, MFS contacted Spangler in attempting to collect on her son's debts. Spangler's son had used her address on his checks and MSF attempted to locate him there. Spangler, therefore, is not a "consumer" within the meaning of the FDCPA. *See* 15 U.S.C. § 1692a(3). Thus, the question arises whether Spangler is entitled to recover for violation of section 1692c(b). The civil liability provision of the Act provides that "any debt collector who fails to comply with any provision of this title with respect to *any person* is liable to such person ...." 15 U.S.C. § 1692k(a) (emphasis added). This section would suggest that Spangler is entitled to recover for a violation of section 1692c(b). On the other hand, the language of section 1692c applies to consumers only. By comparison, other sections of the FDCPA seem to protect all persons, even if they are not "consumers" within the meaning of Act. *See e.g.,* 15 U.S.C. § 1692d ("A debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse *any person* in connection with the collection of a debt.") (emphasis added). Moreover, the primary purpose of section 1692c is to protect the *consumer's* privacy and employment. So it would be incongruous to permit a person other than the consumer to recover for a violation of this section. Therefore, the court holds that Spangler is not entitled to recover under section 1692c(b) for MSF's communications with her in connection with the collection of her son's debts. Accordingly, summary judgment is granted in favor of MSF as to Spangler's third party contact claim.

### 9. Threats of Arrest

Section 1692e(4) and (5) provide:

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:

. . . . .

(4) The representation or implication that nonpayment of any debt will result in the arrest or imprisonment on any person ... unless such action is lawful and the debt collector intends to take such action.

(5) The threat to take any action that cannot legally be taken or that is not intended to be taken.

Thus, a debt collector's threat to have a consumer arrested unless a debt is paid would violate section 1692e(5) if the debt collector could not lawfully do so or did not intend to take such action. Either of these violations would violate section 1692e(4) as well. And a debt collector's representation or implication that nonpayment of a debt will result in the creditor having the consumer arrested or imprisoned would also violate section 1692e(5) if the creditor did not intend to do so or could not legally take such action. Therefore, in the case *sub judice,* partial summary judgment will be granted as to liability for violation of section 1692e(4) and (5) when there is no genuine issue of material fact as to any of these elements.

On June 18, 1979, West received a payment demand notice from MSF which was signed by Kirksey and on which was written the notation "criminal warrant pending." West affidavit ¶ 1, ex. A. Furthermore, according to West, when she inquired at MSF about the debts, Kirksey told her that Kirksey would have a warrant issued for her arrest unless she paid weekly amounts towards her debts. *Id.* at ¶ 2. In late June or early July, 1979, West received another notice from MSF which stated that she should call Kirksey "immediately to prevent issuance of warrant on your worthless check." *Id.* at ¶ 5, ex. B. Finally, West stated that Kirksey came to her home on July 2, 1979, and threatened to issue a warrant for her arrest unless she made the payments. *Id.* at ¶ 6.

Kirksey does not dispute that she would call consumers and tell them that

there were warrants outstanding on their dishonored checks. Kirksey dep. 69. She admits that she wrote "criminal warrant pending" on the demand notice sent to West. *Id.* at 81. But Kirksey also testified that she told consumers that their *creditors* would have them arrested if they did not pay their debts. *Id.* at 69–70, 72. Contrary to West's contentions, a reasonable inference may be drawn from this evidence that Kirksey did not tell West that she would have an arrest warrant issued herself unless West paid the alleged debts. So, even assuming that a debt collector cannot lawfully seek an arrest warrant against a consumer for writing a bad check, the uncertainty as to whether Kirksey threatened to personally obtain a warrant against West precludes partial summary judgment against Kirksey for violation of section 1692e(5). Furthermore, plaintiffs' motion for partial summary judgment as to Kirksey's liability under section 1692e(4) must likewise be denied. Although Kirksey's representations implied that a creditor would have West arrested unless she paid her dishonored checks, such action by a creditor is lawful and the evidence conflicts as to whether West's creditors intended to take such action. West was never arrested for the dishonored checks that Kirksey attempted to collect. Yet Kirksey knew that Kroger, one of West's creditors, had a warrant outstanding against West because she was told this by a Kroger employee. *Id.* at 69, 82. Although Kirksey attempted to collect bad checks written by West to merchants other than Kroger, a reasonable inference may be drawn from the record that Kirksey believed that Kroger intended to have West arrested unless West paid her debt. Thus, it is not perfectly clear that Kirksey's handwritten notations violated section 1692e(4). Accordingly, partial summary judgment is denied as to Kirksey's liability to West for threats of arrest.

■ The facts concerning Walker's claim against Lee are undisputed. On November 18, 1978, Lee told Walker's grandparents and uncle that Walker would be arrested if the debt was not paid. Walker affidavit ¶ 2. Although Walker paid one

debt, on November 20, 1978, Lee called her again and threatened criminal prosecution unless she paid another debt by November 22. *Id.* at ¶ 3. Lee also threatened to have a warrant issued for Walker's arrest if Walker did not pay the debt by December 4, 1976. *Id.* at ¶ 4. Walker was never arrested for passing bad checks, however. Walker dep. 17.

Lee has failed to offer any evidence to dispute Walker's testimony. Thus, it is undisputed that Lee threatened to personally have Walker arrested unless the debts were paid. Walker was never arrested for passing bad checks and Lee has not presented any evidence that she intended to have Walker arrested. Nor is there any evidence that a creditor intended to have Walker arrested unless she paid her debts. Because there is no genuine issue that Lee threatened Walker with arrest when neither Lee nor a creditor intended to take such action, partial summary judgment is granted in favor of Walker as to Lee's liability to her under section 1692e(4) and (5).

■ Both Jackson and Preston allege that Price threatened them with arrest if they failed to pay their debts. According to Jackson, Price repeatedly telephoned her from December 1978 to March 1979, and threatened to have warrants issued for her arrest unless she made monthly payments on her debts. Jackson affidavit ¶ 3; Jackson dep. 18. Price testified, however, that she never threatened Jackson with arrest or imprisonment unless Jackson paid the dishonored checks. Price dep. 9. Rather, she probably told Jackson that the "various companies that she wrote these checks to would issue warrants" if Jackson did not pay her debts. *Id.* at 8. In fact, Price's prediction proved accurate. After MSF returned Jackson's uncollected checks to the creditors, Jackson's creditors issued criminal warrants against her. Jackson dep. 34–35, 39, 40. Thus, the documentary materials before the court present a factual dispute concerning whether Price threatened to personally have Jackson arrested for failing to pay her checks. Moreover, it is undisput-

ed that Jackson's creditors intended to, and actually did, have her arrested for passing bad checks. Accordingly, partial summary judgment is denied on the issue of Price's liability to Jackson for threats of arrest.

▆ Turning to Preston's claim against Price for threats of arrest, on June 23, 1979, Price called Preston about some dishonored checks and said that she had a warrant pending for his arrest which she would issue if he did not pay part of the amount by the next day. Preston affidavit ¶ 1. Although Preston made partial payments on the checks, he continued to receive oral threats from Price that she would issue a warrant for his arrest if he did not pay the remaining balance. *Id.* at ¶¶ 2–4. In addition, Price told him that his failure to pay his checks could result in his arrest. Preston dep. 76. Preston also received notices signed by Price with the notations "warrant pending" and "warrant pending on bad check" written on them. Preston affidavit ¶¶ 5–6, exs. D–E. There is no evidence that Preston was ever arrested for writing bad checks.

Price testified that she did not recall telling Preston what might happen to him if he did not pay the checks. Price dep. 11. Price's failure of memory is insufficient to dispute Preston's statements that Price threatened him with arrest, however. Moreover, even assuming that Price never orally threatened Preston with arrest, *see id.* at 9, Price acknowledged that she wrote the notations on the forms sent to Preston. "Warrant pending" was "just the terminology that [Price had] heard used in the business . . . ." *Id.* at 12. And it is clear that Price did not intend to take such action because she did not even know the meaning of the term "warrant." *Id.* at 14. As to whether a creditor intended to have Preston arrested, Price thought that whoever Preston wrote the check to would probably issue the warrant. *Id.* at 13. But unlike Kirksey, Price has presented no evidence that she had personally learned of a creditor's intent to issue a warrant against Preston. Therefore, partial summary judgment is granted in favor of Preston as to

Price's liability to him under section 1692e(4) and (5).

▆ Concerning Dawson's claim under section 1692e(4) and (5), the record reveals some evidence which contradicts Dawson's assertion that a MSF collection agent named Childress threatened to personally have a warrant issued against him if he did not pay for his dishonored checks. When asked whether there were any threats made against him if he did not pay his debts, Dawson replied that "they said there was a warrant out for my arrest." Dawson dep. 98. This testimony creates a factual question as to whether Childress threatened to personally have Dawson arrested. Moreover, Dawson further testified that, according to the Roanoke City Police Department, there was a warrant pending for his arrest at that time. *Id.* Accordingly, plaintiffs' motion for partial summary judgment is denied as to Dawson's threat of arrest claim.

▆ Turning last to Spangler's threat of arrest claim, the documents before the court reveal that on June 11, 1979, she received a notice demanding that her son pay $50 within 24 hours and stating that bad check warrants were pending. Spangler affidavit ¶ 1 and attached copy of notice. Spangler called MSF and spoke with a collection agent named Messer, who informed her that she had a warrant against her son. Spangler dep. 39, 44. The court is of the opinion that Spangler may be entitled to recover for a violation of section 1692e because that section is not specifically limited to protecting the rights of consumers. Nevertheless, plaintiffs' motion for partial summary judgment is denied as to Spangler's threat of arrest claim because the record is unclear as to whether her son was ever actually arrested for writing bad checks. *Id.* at 47.

In light of the court's rulings above, partial summary judgment is granted against MSF in favor of Walker and Preston for violations of section 1692e(4) and (5). Partial summary judgment against MSF is denied as to the threat of arrest claims of West, Jackson, Dawson, and Spangler.

### 10. Validation of Debts

Among other things, 15 U.S.C. § 1692g(a) requires a debt collector to give a consumer written notice, either in the initial communication or within five days thereafter, of the amount of the debt, the name of the creditor to whom the debt is owed, and

> a statement that if the consumer notifies the debt collector in writing within the thirty-day period [after receipt of the notice] that the debt, or any portion thereof, is disputed, the debt collector will obtain verification of the debt or a copy of a judgment against the consumer and a copy of such verification or judgment will be mailed to the consumer by the debt collector . . . .

If the consumer disputes the debt or requests validation in writing, the debt collector must cease collection efforts until he verifies the debt and mails the verification to the consumer. 15 U.S.C. § 1692g(b).

▮ The named plaintiffs have presented evidence that they never received any written notice of their rights to verify or to dispute the validity of the debts. See West affidavit ¶ 8, exs. A–B; West dep. 38; Walker affidavit ¶ 7, exs. A, C, and E; Preston affidavit ¶ 7. The defendants did include as Exhibit 2 to their answers to request for production of documents what appears to be a typewritten version of the notice required by section 1692g(a). But no named plaintiff ever received such a writing. Indeed, at their depositions, neither Kirksey nor Price were able to recall any forms supplied or used by MSF other than the types received by the plaintiffs. Kirksey dep. 83–85; Price dep. 27. Although a secretary sent the initial letter from MSF to the consumers, there is no evidence that the initial communications contained anything in addition to notice that a check was outstanding, who it was to, and its amount. Kirksey dep. 85. However, this evidence does give rise to a reasonable inference that MSF's secretary, rather than its collection agents, was responsible for providing consumers with the required written notice. This being the case, the court cannot grant partial summary judgment against Price, Lee, and Kirksey for failing to send written notices to the named plaintiffs. If previously met by another MSF employee, the notification requirements under section 1692g(a) would not have to be satisfied a second time by the individual collectors in connection with their collection efforts with respect to the same debts.

▮ Nevertheless, it is undisputed that some MSF employee failed to send the named plaintiffs the required notice. By its terms, however, section 1692g(a) requires only that a debt collector send a *consumer* the written notice. Thus, while Spangler's son may be entitled to recover under section 1692g(a), Spangler cannot in that she is not a consumer under the FDCPA. Therefore, the named plaintiffs other than Spangler and Dent are granted partial summary judgment against MSF for violations of section 1692g(a).[6]

▮ In addition, no evidence has been presented to the court that even suggests that MSF ever sent the required notice to anyone from whom it attempted to collect a debt. Defendants have produced forms that contain the required notice. But there is no evidence whatsoever that these forms were mailed to consumers either at the initial communication or within five days thereafter. On the other hand, there is ample evidence in the attachments to the affidavits of the named plaintiffs, plaintiffs' responses to defendants' request for production of documents, and the exhibits introduced at the class certification and preliminary injunction hearing that MSF regularly disregarded the requirement of written notice. Accordingly, partial summary judgment is granted in favor of the class members on the issue of MSF's liability for a pattern of violations of section 1692g(a).

---

**6.** No evidence has been submitted to the court in support of plaintiff-intervenor Dent's claims. Therefore, the court is unable at this time to rule on plaintiffs' motion for summary judgment relative to Dent's claims against MSF and Costen.

### 11. Service Charges

The evidence shows without question that MSF regularly collected, or attempted to collect, a $15 service charge on each bad check, regardless of the amount of the check. The plaintiffs contend that this practice violated the FDCPA by collecting an amount that was not expressly authorized by the agreements creating the debts or permitted by law, and by misrepresenting the amounts of the debts and the legality of the compensation which the defendants could receive.

### A. Collection of Amounts in Addition to Principal Obligations

Section 1692f(1) provides that a debt collector may not use any unfair or unconscionable means to collect or attempt to collect any debt, such as:

> The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt *or* permitted by law.

(emphasis added). The court is without doubt that a service charge such as that imposed by MSF is a "fee, charge, or expense incidental to the principal obligation . . . ." *Id.* Because there is no factual dispute relative to MSF practice of collecting or attempting to collect the service charges, resolution of the cross-motions for summary judgment depends on whether that practice violates section 1692f(1) as a matter of law.

The lawfulness of a service charge under section 1692f(1) depends on whether the charge is "expressly authorized by the agreement creating the debt or permitted by law." Turning to the first test, the court expressly found after evidence and argument on the preliminary injunction in this case that "this charge is not expressly authorized by the agreement creating the underlying debt." Order entered January 17, 1980, p. 3. Although this finding was for the purpose of injunctive relief only, because the defendants have made no contrary representation, the court finds for the purpose of damages relief that the service charges collected by MSF were not expressly authorized by the agreements creating the underlying debts.[7]

Thus, MSF's collection of service charges is lawful under section 1692f(1) only if the charges are "permitted by law." Plaintiffs argue that because no Virginia or federal statute or other law authorizes the practice, the charges cannot be said to be "permitted by law." The defendants counter this thrust by "the fact that [the practice] is not prohibited by Virginia law." Costen's answer to interrog. no. 12. In other words, the defendants argue that the very absence of any statutory authority concerning service charges justifies the practice because such charges are at least not prohibited by law. As defendants correctly point out, resolution of this issue depends on the interpretation of the phrase "permitted by law." In turn, interpretation of this phrase can

**7.** A debt collector might argue that he was collecting a charge "expressly authorized by the agreement creating the debt" in the following situation. The debt collector enters into an agreement with a retail grocery store to provide collection service on its past-due checks. As part of the agreement the debt collector will receive $15 for each check collected. In turn, the grocery is to post a sign notifying its customers that their checks are now being collected by the particular debt collector and that there will be a $15 service charge for all returned checks. The debt collector then attempts to collect the amount of the dishonored check plus the $15 service charge. Pursuant to the agreement between the grocery and debt collector, once the check is collected, the grocery would receive the amount of the check and the debt collector would keep the $15 service charge. Assuming that state law permitted collection fees to be added-on to the amount of the debt itself, whether the service charge had been properly provided for by the posting of a sign notifying the creditor's customers of its agreement with the debt collector would be determined under state contract law. Regardless, there is no evidence in the case *sub judice* that MSF entered into any such agreement with its clients. Indeed, the evidence before the court is to the contrary. MSF's collections agreement provides that the creditor shall pay to MSF "as the sole compensation under this agreement ____% of the collections effected by [MSF] upon accounts referred to it by [the creditor]."

only be done in context with the entire provision.

 Looking to the plain language of 1692f(1), the court interprets the section to permit the collection of a fee in addition to the principal obligation if such fee is expressly authorized by the agreement creating the debt or is otherwise permitted by state law. Thus, the agreement creating the debt need not expressly authorize the fee if state law affirmatively permits a collection fee even if not specified in the agreement. However, the agreement must expressly authorize the fee if state law permits such a fee only if specified in the agreement. And no such fee may be collected even if provided for in the agreement if state law prohibits a collection fee in addition to the principal obligation because a contract can never impose charges that are prohibited by state law.

 But Virginia law neither expressly permits nor expressly prohibits a third party debt collector from collecting add-on fees. Thus, if valid under state contract law, an agreement relative to such fees would be permitted because it would not be expressly prohibited by state law. But when, as here, the agreements creating the debts did not expressly authorize the fee, the question is whether Virginia's silence on this specific issue constitutes legal permission to collect the fee. The court holds that it does not. In the context of this case, the court interprets section 1692f(1) to mean that if state law does not expressly permit or prohibit a debt collector from collecting a service charge in addition to the amount of a dishonored check, then such charge is lawful only if the agreement creating the debt expressly authorizes it. Simply stated, "permitted by law" is different from "not prohibited by law." Permission requires an affirmative authorization, not just indulgent silence. So the fact that Virginia does not expressly prohibit such charges does not mean that state law permits them in the absence of an agreement providing for such; rather, it means the contrary.[8] Therefore, the court holds that the service charges collected by Multi-Service were not "permitted by law" as that phrase is used in the FDCPA.

It is undisputed that Lee collected a service charge from Walker and that Price collected a service charge from Preston. Walker affidavit ¶¶ 3–4, exs. A–B; Preston affidavit ¶¶ 2–3, exs. B–C. Nor is there any question that MSF collected a service from Jackson. Jackson affidavit ¶ 7.

Accordingly, partial summary judgment is granted against MSF in favor of Walker, Preston, Jackson, and the members of the subclass for liability under section 1692f(1). In addition, partial summary judgment is granted against Lee in favor of Walker,

---

**8.** This is consistent with the manner in which Virginia law provides for the imposition of service charges for bad checks in other situations. For instance, a state court, upon a determination that the plaintiff has prevailed in a civil action to recover the sum payable on a bad check drawn by the defendant, "shall add the following amounts, as costs, to the amount due the plaintiff for the check: (i) the sum of ten dollars to defray the cost of processing the returned check ...." Va.Code § 6.1–118.1 (1979 Repl.Vol.). A small loan licensee is prohibited from adding additional charges for services except insurance premiums paid by the licensee and "a handling fee not to exceed ten dollars for each check returned to the licensee because the drawer had no account or insufficient funds in the payor bank." Va.Code § 6.1–278 (1982 Cum.Supp.). If a fine is paid with a check that is returned unpaid by the payor bank, the "court to whom the unpaid check was tendered may impose a fee of ten dollars or ten percent of the value of the check, whichever is greater, in addition to the fine and costs already imposed." Va.Code § 19.2–353.3 (1982 Cum.Supp.). If the Division of Motor Vehicles receives a bad check, "there shall be a penalty of twenty-five dollars or ten percent of the amount of the check, whichever is greater, imposed upon the person from which such payment is due the Division." Va.Code § 46.1–35.1 (1982 Cum.Supp.). Similarly, "there shall be an additional fee of ten dollars imposed upon the party presenting ..." a bad check to the State Corporation Commission. Va.Code § 56–304.14 (1981 Repl.Vol.). In light of these express statutory authorizations for the collection of service charges for bad checks in certain circumstances, the court concludes that Virginia law does not permit such charges absent either express statutory authorization or agreement between the drawer and payee. Otherwise, the above statutes would be superfluous.

and against Price in favor of Preston for violations of section 1692f(1).

## B. Misrepresentation of the Debts and the Legality of Charges

Plaintiffs also assert that MSF's practice of attempting to collect service charges on each bad check violates section 1692e(2)(A) and (B). This section provides

A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt [such as the] false representation of—

(A) the character, amount, or legal status of any debt; or

(B) any services rendered or compensation which may be lawfully received by any debt collector for the collection of a debt.

15 U.S.C. § 1692e(2)(A) and (B).

On June 18, 1979, West received a notice from MSF signed by Kirksey, which demanded total payment of $234.80 on six bad checks. West affidavit ¶ 1, ex. A. The notice did not advise West that MSF had added-on a service charge on each of the bad checks; it just listed the total amount of the checks as $238.80. West dep. 16–17, 38. Indeed, West was never told that MSF was adding service charges on to the checks which it attempted to collect from her. *Id.* at 33. Kirksey has presented no evidence to dispute these facts. Thus, at the very least, it is perfectly clear that Kirksey misrepresented the amount of West's debts. Accordingly, partial summary judgment is granted in favor of West against Kirksey and MSF for violation of section 1692e(2)(A).

Furthermore, when MSF finally did provide West with verification of the debts, the verification claimed that she owed a $20 service charge for each check. And there is no dispute that the service charges were a primary source of compensation for individual collectors and a substantial source of income for MSF. As discussed above, there was no legal basis for imposing the service charges. Therefore, the service charges were compensation which cannot be "law-fully received." Accordingly, partial summary judgment is also granted in favor of West against Kirksey and MSF for violating section 1692e(2)(B) by misrepresenting the compensation which may be lawfully received for the collection of a debt.

Turning to Walker's claims, partial summary judgment must be denied as to the liability of Lee and MSF under section 1692e(2)(A). There is some evidence that Lee told Walker that MSF was charging her a service charge and that Walker knew the amounts of the checks which Lee was collecting. Walker dep. 24–25. Thus, it cannot be said that there is no genuine issue of material fact relative to whether the defendants misrepresented the amount, character, or legal status of the debts allegedly owed by Walker. Nevertheless, partial summary judgment is granted in favor of Walker against Lee and MSF for violation of section 1692e(2)(B) because it is undisputed that Lee misrepresented the compensation which she and MSF could lawfully receive.

Concerning the claims of Jackson and Preston, the record indicates that Jackson never received any written materials from MSF. Moreover, Jackson stated that when Price spoke to Jackson's sister on December 4, 1978, Price told her that Jackson had to make monthly payments for dishonored checks and service charges. Jackson affidavit ¶ 2. Because this evidence presents a factual dispute relative to whether Price or any other MSF employee failed to disclose that service charges were being added-on to the amount of the checks, partial summary judgment is denied as to the liability of Price and MSF to Jackson under section 1692e(2)(A). But there is no evidence to contradict that Price misrepresented the compensation which she and MSF could lawfully receive; therefore, partial summary judgment is granted in favor of Jackson against Price and MSF for violation of section 1692e(2)(B).

Unlike Jackson, Preston did receive printed forms from MSF which were signed by Price. These forms failed to dis-

close that a service charge had been added into the total amount of the alleged debt. Preston affidavit, exs. A, and D–E. Price and MSF have failed to contradict this evidence in any manner. However, there is no evidence that Price ever represented to Preston that she could lawfully collect the service charge as compensation. Accordingly, partial summary judgment is granted in favor of Preston against Price and MSF for violation of section 1692e(2)(A), and denied as to the liability of Price and MSF to Preston under section 1692e(2)(B).

With respect to Dawson's claims against MSF under section 1692e(2)(A) and (B), MSF has failed to establish any factual question as to the accuracy of Dawson's evidence. In June 1979, a MSF collection agent named Childress demanded payment from Dawson of $365 for ten dishonored checks. Dawson affidavit ¶ 1. However, it was not until after Dawson inquired at MSF about the checks that she learned that this amount included a $15 service charge on each check. *Id.* at ¶¶ 2, 4. Accordingly, partial summary judgment is also granted in favor of Dawson against MSF for violations of section 1692e(2)(A) and (B).

The notice that Spangler received from MSF demanded that her son pay $50 within 24 hours. Spangler affidavit ¶ 1. Spangler asked for and received copies of two dishonored checks written by her son. The total amount of these two checks was $20. When Spangler inquired at MSF about the discrepancy, Messer told her that there was a $15 service charge imposed on each check. *Id.* at ¶ 3; Spangler dep. 39. There is nothing in the documentary materials before the court to dispute this evidence. Although Spangler is not a consumer under the Act, section 1692e(2)(A) and (B) does not protect only consumers; rather, it is designed to discourage certain debt collection practices. Thus, the court is of the opinion that Spangler is able to recover for a violation of section 1692e(2)(A) and (B). Therefore, because there is no genuine issue of material fact that MSF misrepresented the amount of her son's debt and the legality of its compensation from service charges, partial summary judgment is granted in favor of Spangler against MSF for violation of section 1692e(2)(A) and (B).

As discussed above, factual questions exist as to whether some of the named plaintiffs were not told service charges had been added to the debts or told that MSF could lawfully collect such charges. Thus, it cannot be said that there is no genuine issue of material fact as to whether MSF violated the rights of each class member under section 1692e(2)(A) and (B). Accordingly, partial summary judgment is denied as to the liability of MSF to the class members under section 1692e(2)(A) and (B).

12. Piercing the Corporate Veil

Costen has moved for summary judgment in his favor on the grounds that the undisputed facts show that he is not a debt collector within the meaning of the FDCPA. The court does not agree. For the purpose of the FDCPA, a "debt collector" is "any person who . . . regularly collects or attempts to collect, directly or *indirectly,* debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6) (emphasis added). Costen never personally attempted to collect any debts as would MSF's collection agents. Costen dep. 63. Thus, it cannot be said that he regularly attempted to collect directly debts asserted to be owed another.

Nevertheless, Costen indirectly collected debts in that he obtained new collection accounts for MSF from merchants and retailers. *Id.* at 30. Indeed, although other people also obtained new accounts for MSF, it seems highly unlikely that MSF could have maintained a collection business without Costen's services because Costen sold more accounts than anyone else. *Id.* at 37. Costen's collection indirectly of debts is shown further by the fact that he received a commission on the amounts that MSF earned from the accounts that he personally obtained. Therefore, the court holds that Costen is a "debt collector" under the FDCPA and, accordingly, denies Costen's motion for summary judgment on the ground that he is not a debt collector.

■ Although Costen is a "debt collector" for the purpose of the court's subject matter jurisdiction over him pursuant to the FDCPA, there is no allegation or evidence that he personally violated any provisions of the Act and, unlike MSF, he cannot be held vicariously liable for the statutory violations of MSF's collection agents. An officer of a corporation cannot be held personally liable for the wrongful conduct of the corporation's employee's absent personal involvement with the conduct.

■ But not only was Costen MSF's President, he was also its dominant shareholder. Costen originally owned 83 of 98 outstanding shares of the corporate stock and he maintained a majority interest as more shares were issued. After his marriage to MSF's former assistant secretary, Costen transferred 237 shares of stock to his wife, retaining 83 shares for himself— giving he and his wife a total of 320 of the 500 authorized shares. Regardless of the stock transfer to his wife, applying IRS attribution rules, Costen was still MSF's dominant shareholder, owning 64% of MSF's authorized stock. 1978 corporate tax return of MSF. Therefore, as MSF's dominant shareholder, Costen can be held personally liable under the FDCPA if the undisputed facts of this case justify disregarding MSF's corporate entity.

■ The law in this circuit relative to piercing the corporate veil is well described in *DeWitt Truck Brokers v. W. Ray Flemming Fruit Co.*, 540 F.2d 681 (4th Cir.1976). A corporate entity generally will be recognized as a separate entity, functioning through its officers and directors, to which its creditors must look for satisfaction of debts and obligations incurred in the corporate name. "The very purpose of the corporate structure is the advancement of limited liability of investors with an underlying legislative policy directed to the encouragement of investments. Consequently, the corporate structure should never lightly be disregarded." *In re County Green Ltd. Partnership*, 438 F.Supp. 701, 705 (W.D.Va. 1977), *rev'd*, 604 F.2d 289 (4th Cir.1979) (district court erred in reversing bankrupt-

cy court's decision not to pierce corporate veil because such was not clearly erroneous). The corporate structure is not, however, a shield for dominant shareholders to hide behind while defrauding or injuring creditors, or conducting illegal operations. Thus, "when substantial ownership of all the stock of a corporation in a single individual is combined with other factors clearly supporting disregard of the corporate fiction on grounds of fundamental equity and fairness...", *Truck Brokers,* 540 F.2d at 685, the corporate entity will be disregarded and liability fastened on the individual shareholder.

Courts have considered the following factors in determining whether to disregard the corporate entity: inadequacy of corporate capitalization for the venture undertaken; failure to observe corporate formalities; non-payment of dividends; insolvency of the debtor corporation at the relevant time; siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers or directors; absence of corporate records; and the fact that the corporation is a mere facade for the dominant shareholder. *Id.* at 685–687. Of course, the conclusion to disregard the corporate entity must involve a number of these factors; no single factor is sufficient.

> But undercapitalization, coupled with disregard of corporate formalities, lack of participation on the part of the other stockholders and the failure to pay dividends while paying substantial sums, whether by way of salary or otherwise, to the dominant stockholder, all fitting into a picture of basic unfairness, has been regarded fairly uniformly to constitute a basis for imposition of individual liability under the doctrine.

*Id.* at 687 (footnote omitted). Analyzed in this light, the undisputed facts of this case justify disregarding MSF's corporate form and imposing individual liability upon Costen for MSF's violations of the FDCPA.

In 1974 MSF was formed as a Pennsylvania corporation with only 500 shares of common stock at $2 each par value, for a total authorized capital of $1,000. Costen an-

swers to interrog. no. 2; supplemental answer no. 1. During the course of its operations, rather than expanding, MSF's capital base has contracted by the 10 shares of authorized stock that were returned to the treasury. Costen answers to interrog. no. 2.

Aside from its $1,000 capital base, MSF had few assets beyond 3 typewriters, 2 calculators, a minimal amount of office furniture, and several file cabinets. Costen dep. 49. MSF maintained no reserve for contingencies. *Id.* at 69. Thus, it is not surprising that a $15,000 loan from Liberty Bank of Bedford was obtained on the personal signatures of Costen and Johnson rather than on the credit of MSF. *Id.* at 66–67.

■ Although the consumers from whom MSF attempted to collect debts cannot claim that they have been unduly influenced by the corporate front, a judgment creditor, including a victim of a statutory illegality, can be as effectively defrauded as a contractual creditor and is equally allowed to pierce the corporate veil in the appropriate situation. *See, e.g., Anderson v. Abbott,* 321 U.S. 349, 64 S.Ct. 531, 88 L.Ed. 793 (1944) (defendant shareholders of holding company personally liable for statutory corporate obligations not met by the company); *Minton v. Cavaney,* 56 Cal.2d 576, 15 Cal.Rptr. 641, 364 P.2d 473 (Cal. 1961) (director personally liable when swimming pool company had no assets or insurance to cover drowning or personal injury claims of patrons or their survivors). Indeed, a victim of a statutory illegality or tort may be more entitled to pierce an undercapitalized corporation because, unlike a contractual creditor, the former's dealings with the corporation are involuntary and uninformed.

■ At any rate, undercapitalization is a ground for piercing the corporate veil because it is "the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities." *Ballentine on Corporations,* 302–303 (1946 ed.). MSF, like any debt collection agency, faced prospective liabilities under the FDCPA because claims thereunder

are a predictable risk of a collection business, even for an agency that attempts to comply with the Act. Moreover, MSF's potential loss for even a single claim is statutory damages up to $1,000 plus actual damages and attorneys fees. Patently, MSF's woefully inadequate capitalization would barely cover even a single individual statutory penalty at the maximum level, much less a number of claims or a class claim. Thus, the uncontested facts show that MSF was grossly undercapitalized to operate as a collection agency.

But not only was MSF undercapitalized, it also never paid a shareholder dividend. Costen's answer to interrog. no. 5. Yet Costen received substantial income from MSF in the form of commissions for obtaining new accounts for collection. Although others who obtained new accounts received the same remuneration, Costen testified that he sold more accounts than anyone else. Costen dep. 36–37. That Costen was siphoning the funds of the corporation is illustrated by putting Costen's compensation in perspective with MSF's earnings during the same period. MSF suffered a net loss each year during 1976–1978 and its net gain in 1979 was only $282. 1979 MSF corporate tax return. By comparison, Costen's remuneration during these years amounted to $2,567 in 1976, $6,184 in 1977, $15,428 in 1978, and $17,325 in 1979. *Id.*

But at the very peak of his earnings from MSF, Costen's participation in the business was insignificant. He estimated that between August 1979 and June 1980, he spent only 10% to 15% of his time working for MSF. Costen dep. 39. Moreover, Costen received significant remuneration for his modest participation in the business even though MSF was insolvent in early 1977 and had to obtain a substantial loan upon the personal signatures of Costen and Johnson "as opposed to the corporation's worthiness." *Id.* at 66–68.

MSF apparently maintained at least a semblance of corporate records, including minutes of shareholders' and directors' meetings. Nevertheless, the undisputed facts reveal that Costen considered MSF to

be his own personal business vehicle. Costen's mother ran MSF's office in Norfolk, Virginia, and when asked her job description, Costen answered that she "helps her son." *Id.* at 25. Costen obtained personal loans from MSF which were never passed upon or approved by the MSF board of directors. *Id.* at 34. Similarly, the percentage of commissions received by Costen and other MSF personnel as compensation were "internal decisions" not made by the board of directors, but by Costen's subordinates, Johnson and Shisler. *Id.* at 47. Furthermore, MSF never obtained a business license from the City of Roanoke, Virginia prior to the filing of this suit. Costen's disregard for MSF's interest is shown further by his failure to comply with the record-keeping requirements of state law. *See* Virginia Collection Agency Board Rules and Regulations, POR. 21–14 (March 19, 1975). Despite the regulatory requirements that records be kept showing the names of the creditors and debtors, and the dates and amounts of any payments made, MSF kept no records of all consumers from whom it collected debts, and the work cards used during collections were destroyed as a standard procedure. Costen dep. 56–57, 52–54; answer to supplemental interrog. no 18.

Perhaps the most important reason to disregard MSF's corporate form and impose personal liability on Costen is that it would be unfair to the plaintiffs and contrary to the purpose of the FDCPA to uphold MSF's corporate facade. Although some issues still remain for trial, upon undisputed facts MSF is liable to the plaintiffs for some blatantly illegal collection practices. Yet MSF is no longer doing business, *see* footnote 1 *supra,* and it thus seems likely that its assets, if any remain, will be totally inadequate to meet plaintiffs' damages. True, some of the plaintiffs may be able to recover from defendants Kirksey, Lee, and Price. But other named plaintiffs as well as the class and subclass members will recover nothing if their sole remedy lies against MSF only.

Costen apparently did not personally collect any debts. Nevertheless, he reaped substantial monetary gains from MSF's collections. Moreover, the undisputed facts compel the conclusion that Costen knew or should have known of MSF's violations of the FDCPA. He was at all times MSF's president and maintained his office on the corporate premises. Although Bob Shisler was MSF's office manager, there is no question that MSF received numerous complaints about its collection practices from the Better Business Bureau of Western Virginia, Inc., and that Costen personally responded to one such complaint in August 1978. Stephanz affidavit; Costen dep. 62. Thus, to give effect to the corporate vehicle here would be to shield the real owner of MSF from the liabilities which should accompany his rewards from MSF's collection practices.

Furthermore, the FDCPA's purpose "to eliminate abusive debt collection practices by debt collectors," 15 U.S.C. § 1692a, would be frustrated if MSF's corporate facade was an effective shield against persons seeking their private remedies under the Act. To uphold the corporate facade here would illustrate that a corporate collection agency, by operating with a minimum of assets and a fast cash flow, can be effectively judgment proof and yet be a thriving source of income for its owner. On the other hand, to disregard MSF's corporate form and impose liability on Costen would be consistent with the Act's expansive definition of a "debt collector" as any person "who regularly collects or attempts to collect, *directly or indirectly,* debts owed ... or due another." 15 U.S.C. § 1692a(6) (emphasis added).

Thus, the court concludes that Costen has misused the corporate form and that justice requires that MSF's corporate form be disregarded and liability imposed upon Costen. Therefore, the plaintiffs' motion for partial summary judgment is granted as to issue of Costen's liability under the FDCPA. Accordingly, Costen is liable to the plaintiffs to the same extent as MSF is liable to the plaintiffs.

13. Summary of the Disposition of the Parties' Motions

For the reasons stated above, the court grants summary judgment for the defend-

588

ants as to the claims of Preston and Spangler that the defendants violated section 1692c(b) of the FDCPA. Costen's motion for summary judgment in his favor is denied, however. The court declines to rule on the plaintiffs' motion for partial summary judgment relative to Dent's claims.

As to the claims under section 1692g(a), the court grants partial summary judgment against MSF and Costen in favor of West, Walker, Jackson, Preston, Dawson, and the class members; denies partial summary judgment against Kirksey, Price, and Lee; and grants summary judgment in favor of the defendants against Spangler.

The court grants partial summary judgment in favor of West against Kirksey, MSF, and Costen for violation of section 1692e(2)(A) and (B), and denies partial summary judgment as to West's claims under sections 1692c(b) and 1692e(4) and (5).

As to Walker's claims, the court grants partial summary judgment as to the liability of Lee, MSF, and Costen for violations of sections 1692c(b), 1692e(4) and (5), 1692f(1), and 1692e(2)(B), and denies partial summary judgment as to these defendants' liability under section 1692e(2)(A).

Concerning Jackson's claims, the court grants partial summary judgment against Price, MSF, and Costen for violations of sections 1692c(b) and 1692e(2)(B); grants partial summary judgment against MSF and Costen for violation of section 1692f(1); and denies partial summary judgment against these defendants for violations of sections 1692e(4) and (5), and 1692e(2)(A).

Turning to Dawson's claims, the court grants partial summary judgment against MSF and Costen for violations of sections 1692c(b) and 1692e(2)(A) and (B); and denies partial summary judgment against MSF and Costen for violation of section 1692e(4) and (5).

Preston is granted partial summary judgment against Price, MSF, and Costen for violations of sections 1692e(4) and (5), 1692f(1), and 1692e(2)(A); and is denied partial summary judgment against these defendants for violation of section 1692e(2)(B). The court grants partial summary judgment in favor of Spangler against MSF and Costen for violation of section 1692e(2)(A) and (B); and denies partial summary judgment in favor of Spangler for violation of section 1692e(4) and (5).

The members of the subclass are granted partial summary judgment against MSF and Costen for violations of section 1692f(1), and the class members are denied partial summary judgment against MSF and Costen for violations of section 1692e(2)(A) and (B). In addition, the class is decertified as to the claims under sections 1692c(b) and 1692e(4) and (5).

Accordingly, the claims for which partial summary judgment have been denied and the issues of damages remain for trial.

IT IS SO ORDERED.