Rebecca H. and Bryan J. DITTY,
et al., Plaintiffs,

v.

CHECKRITE, LTD., INC.,
et al., Defendants.

Civil No. 2:95–CV–430C.

United States District Court,
D. Utah,
Central Division.

Aug. 11, 1997.

Lester A. Perry, Kesler & Rust, Salt Lake City, UT, for Petitioners.

Daniel P. Shapiro, Goldberg, Kohn, Bell, Black, Roosenbloom & Moritz, Ltd., Chicago, IL, Mark O. Morris, Snell & Wilmer LLP, Salt Lake City, UT, Paul C. Droz, Blackburn & Stoll LC, Salt Lake City, UT, for Respondents.

## AMENDED MEMORANDUM DECISION AND ORDER

CAMPBELL, District Judge.

This matter is before the court on the parties' cross-motions for summary judgment. A hearing on the parties' motions was held on April 29, 1997. Lester Perry appeared on behalf of plaintiffs, Mark Morris and Julie Thomas appeared on behalf of CheckRite,[1] and Paul Droz and Dori Petersen appeared on behalf of Richard H. DeLoney (sometimes "DeLoney") and DeLoney & Associates, L.L.C. ("DeLoney & Associates"). Having fully considered the arguments of counsel presented at the hearing, the memoranda and supporting materials submitted by the parties, and the applicable legal authorities, the court now enters this Memorandum Decision and Order.

## I. BACKGROUND

Plaintiffs are individuals who wrote bad checks for retail purchases in amounts ranging from $2.85 to $46.68. These checks were referred by various merchants to CheckRite for collection. CheckRite sent two collection letters to plaintiffs and subsequently relinquished collection efforts to DeLoney & Associates, the law firm representing CheckRite. DeLoney & Associates sent a third

---

1. The various CheckRite entities named as defen- dants are collectively referred to as "CheckRite."

letter, which informed each plaintiff that their dishonored check "ha[d] been referred by CheckRite to our law firm for litigation." The letter went on to state that the matter could be settled, out of court, for the sum of the face amount of the check, a $15.00 service charge, and an amount ranging from $73.00 to $83.00 listed as "Legal Consideration for Covenant not to Sue." The letter sent to the Dittys also warned of a potential civil action for the amount of the check and stated that other actions, "including fraud in the inducement, negligent misrepresentation, civil shoplifting, or theft by check may also be considered." This warning was not included in the letters sent to the other plaintiffs. In addition to providing check collection services, CheckRite maintains a nationwide check verification system that allows subscribers to access a database to determine whether a check writer has written bad checks in the past.

Richard DeLoney established DeLoney & Associates in September 1994. From the date of its formation until February or March of 1996, DeLoney & Associates was organized as a limited liability company under Utah law. In approximately March 1996, DeLoney & Associates reorganized as a Utah professional corporation.[2] Richard DeLoney has always been the firm's sole attorney. He authored the collection letters sent to the plaintiffs, trained the firm's collection agents, and determined the settlement amounts offered to plaintiffs. DeLoney & Associates collected dishonored checks for CheckRite in the states of Utah, Arizona, and Washington. CheckRite was the firm's largest client, generating one-third to one-half of the firm's income. Between July 1, 1994 and May 9, 1995, CheckRite referred to DeLoney & Associates approximately 9,025 dishonored checks written by Utah residents. During this period, DeLoney & Associates filed twenty-four lawsuits in connection with its collection work for CheckRite. This total included actions for fraud in the inducement, negligent misrepresentation, and civil shoplifting; however, none of the fraud, misrepresentation, or shoplifting actions were filed before DeLoney & Associates sent its March 6, 1995 collection letter to the Dittys.

DeLoney & Associates collected dishonored checks for CheckRite pursuant to an oral agreement negotiated by Richard DeLoney and Neil Auerbach, CheckRite's Senior Vice–President. Under the agreement, when DeLoney & Associates settled an account, CheckRite was to receive the face amount of the dishonored check plus $20.00; DeLoney & Associates was entitled to the remainder of the settlement proceeds.

CheckRite's Salt Lake City offices and DeLoney & Associates occupied space in the same office building. Accounts were referred by CheckRite to the firm electronically, and once the referral was made, DeLoney & Associates was able to access CheckRite's computer system to review account information. Upon receiving an account referral, DeLoney & Associates' computer system automatically generated a collection letter addressed to the writer of the dishonored check.

Plaintiffs'[3] Third Amended Complaint asserts claims under the Fair Debt Collection Practices Act ("FDCPA" or "Act"), 15 U.S.C. §§ 1692–1692o (1982 & Supp.1997), claims under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681–1681u (1982 & Supp.1997), and various state law causes of action[4] against CheckRite, DeLoney & Associates, and Richard H. DeLoney.[5] Plaintiffs

---

**2.** Because DeLoney & Associates was a limited liability company at all times relevant to this litigation, all references herein to "DeLoney & Associates" refer to DeLoney & Associates, L.L.C.

**3.** Plaintiffs have moved to have this case certified as a class action, a matter pending before the United States Magistrate Judge. Accordingly, the only plaintiffs now before the court are those named in plaintiffs' Third Amended Complaint.

**4.** The parties do not move for summary judgment on the state law claims.

**5.** Plaintiffs also alleged claims against John Hawks a/k/a John Hawkes, another attorney alleged to have done collection work for CheckRite, Robert LaMarr, DeLoney & Associates' office manager, and certain merchants who contracted with CheckRite for check collection services. The merchant defendants were dismissed from the action by stipulated Order. Order, May 31, 1996 (Docket No. 109). LaMarr and Hawks have never been properly served with process pursuant to Fed.R.Civ.P. 4.

previously sought summary judgment against CheckRite, DeLoney & Associates, and Richard DeLoney; the latter two defendants previously moved to dismiss plaintiffs' initial complaint. These prior motions presented some of the issues now raised by the pending motions. On January 25, 1996, the court denied the prior motions on the ground that the record did not permit a legal finding that collection of dishonored checks falls outside the coverage of the FDCPA. Order, January 25, 1996 (Docket No. 76).

## II. STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986): *Pueblo of Santa Ana v. Kelly*, 104 F.3d 1546, 1552 (10th Cir.1997). The fact that the parties have filed cross-motions for summary judgment does not affect the applicable standard. *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993).

Once the moving party has carried its burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(e)). The non-moving party must "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the non-moving party's case is insufficient; there must be evidence on which the jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

The following issues are raised by the pending motions: (1) the scope of the FDCPA, that is, whether the obligation created by a dishonored check is a "debt" as defined by the Act; (2) if the Act does apply, whether defendants' conduct violated it; (3) whether defendants violated the FCRA; (4) whether CheckRite may be held liable for the actions of its attorney; (5) whether Richard DeLoney may be held personally liable for the collection activities of DeLoney & Associates; (6) whether plaintiffs are entitled to injunctive relief; and (7) whether the FDCPA claims of plaintiffs Crandall and Robison are cognizable under the Act.

### A. Scope of the FDCPA

The FDCPA prohibits a debt collector from using certain abusive practices to collect a "debt;" therefore, the Act's scope is necessarily limited by its definition of this term. The Act defines a "debt" as:

any obligation or alleged obligation to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes whether or not such obligation has been reduced to judgment.

15 U.S.C. § 1692a(5). Defendants maintain that the Act is not implicated here because a dishonored check does not involve an offer or extension of credit, a condition defendants argue must be read into the definition of "debt."

Three circuits have addressed the breadth of the FDCPA's definition of "debt:" the Third Circuit in *Zimmerman v. HBO Affiliate Group*, 834 F.2d 1163 (3d Cir.1987), the Seventh Circuit in *Bass v. Stolper, Koritzinsky, Brewster & Neider*, 111 F.3d 1322 (7th Cir.1997), and the Ninth Circuit in *Charles v. Lundgren & Assocs., P.C.*, 119 F.3d 739 (9th Cir.1997). In *Zimmerman*, the defendant cable television companies demanded that plaintiffs pay for allegedly pirated microwave television signals. Plaintiffs sued, arguing, *inter alia*, that the defendants' collection methods ran afoul of the FDCPA. Affirming the district court's dismissal of plaintiffs' FDCPA claims, the Third Circuit first deter-

mined that the term "transaction" in the Act's definition of "debt" did not include asserted tort liability, but rather included only contractual or consensual consumer exchanges. *Zimmerman,* 834 F.2d at .1168. Pirating cable television signals, reasoned the court, did not constitute such an exchange. *Id.* The court then added, without discussion or analysis, that a "debt" under the FDCPA arises from "the same type of transaction as is dealt with in all other subchapters of the Consumer Credit Protection Act, i.e., one involving the offer or extension of credit to a consumer." *Id.* However, *Zimmerman* did not address the issue here—whether the obligation created by a dishonored check constitutes a "debt" under the Act.

In *Bass,* the Seventh Circuit confronted this issue and addressed many of the same arguments advanced by defendants. Beginning with the text of the FDCPA itself the court determined that the Act's definition of "debt" was clear, unambiguous, and devoid of any condition mandating that a "debt" involve an offer or extension of credit. *Bass,* 111 F.3d at 1325–26. Thus, "[a]s long as the transaction creates an obligation to pay, a debt is created." *Id.* at 1325. The court concluded that a check creates just such an obligation to pay, and should the check be dishonored, the obligation remains. *Id.* Looking beyond the Act's terms, the court determined that "the [FDCPA's] legislative history, provides an unequivocal statement of the drafters' intent on this issue: [T]he committee intends that the term 'debt' include consumer obligations paid by check or other non-credit consumer obligations." ' *Id.* at 1327 (quoting H.R.Rep. No. 95–131, 95th Cong. 1st Sess., 4 (March 29, 1977)), U.S. Code Cong. & Admin. News at 1695, 1698. In light of the Act's language and legislative history, the court rejected the notion that the Act's codification as an amendment to the Consumer Credit Protection Act ("CCPA"), 15 U.S.C. §§ 1601–1615, evidenced congressional intent to limit coverage of the Act to debts arising from credit transactions. *Id.* at 1328. The court found the statutory structure unpersuasive "in light of the continuing expansion of the CCPA's protective landscape," and observed that "[a]lthough the CCPA as originally enacted may have focused on consumer protection in credit-based

financial transactions, amendments to the Act suggest an enlargement of the CCPA to include consumer protections in other financial arenas." *Id.* The location of these amendments, including the FDCPA, "as amendments to the CCPA evidence the nature of the CCPA as a set of functionally free-standing acts united not by their regulation of credit transactions, but by their goal of providing protection to consumers in a variety of potentially abusive financial situations." *Id.* Distinguishing *Zimmerman,* the court observed that the Third Circuit's sweeping conclusion was based solely on the Act's placement in the CCPA and considered neither the unambiguous language of the Act's definition of "debt" nor the Act's legislative history, factors that the Seventh Circuit found probative of Congress' intent. *Id.* at 1326.

*Charles* represents the most recent appellate examination of the FDCPA's coverage. Finding the Seventh Circuit's reasoning in *Bass* to be "sound," the Ninth Circuit concluded that "[a] dishonored check constitutes an FDCPA 'debt,' and therefore the FDCPA prohibits check collectors from using abusive practices." *Charles,* 119 F.3d at 742.

This court joins the Seventh and Ninth Circuits in reaching the same conclusion. Accordingly, defendants' motions for summary judgment are denied on this issue.

## B. FDCPA Claims

Plaintiffs allege that defendants violated the Act by: (1) attempting to collect excessive fees; (2) violating plaintiffs' debt validation rights; (3) making a variety of threats and misleading representations; (4) and improperly using CheckRite's check verification system (also claimed to be a violation of the FCRA).

### 1. *Excessive Fees*

Plaintiffs maintain that defendants' attempts, in some instances successful, to collect amounts significantly greater than the face amounts of plaintiffs' dishonored checks violated § 1692f(1) of the Act, which prohibits "[t]he collection of any amount ... unless such amount is expressly authorized by the agreement creating the debt or permitted by

law" and violated § 1692e, which prohibits "any false, deceptive, or misleading representation or means in connection with the collection of any debt." [6] It is clear that plaintiffs never authorized defendants, by agreement or otherwise, to collect the fees they sought. Therefore, unless such fees are permitted by Utah law, defendants' collection efforts violated § 1692f(1). *See Patzka v. Viterbo College*, 917 F.Supp. 654, 659 (W.D.Wis.1996); *Newman v. Checkrite*, 912 F.Supp. 1354, 1367–68 (E.D.Cal.1995).

■ Utah's dishonored instruments statute, Utah Code Ann. §§ 7–15–1 to –3 (1995), allows the holder of a dishonored check to "impose a service charge that may not exceed $15." § 7–15–1(2). The drawer of a dishonored check may be liable for a sum greater than the face amount of the check, plus the service charge, only if a civil collection action is filed. § 7–15–1(3). CheckRite never itself attempted to collect excessive fees. Its collection letters requested from each plaintiff only the face amount of the dishonored check plus a $15.00 service charge. However, as discussed more fully *infra*, Part III.D, CheckRite may incur vicarious liability under the Act for violations of § 1692f(1) committed by DeLoney & Associates.

It is undisputed that DeLoney & Associates attempted to collect fees greater than $15.00 through the "covenant not to sue" practice without first having filed suit. Indeed, the very goal of the letter sent by the firm to plaintiffs was to settle their accounts short of actual litigation. The dishonored instruments statute is clear: Until a civil action is filed, fees in excess of $15.00 may not be charged. Therefore, the fees DeLoney & Associates attempted to collect were not permitted by Utah law and, in fact, violated Utah law.

DeLoney & Associates argues that because it could have sued plaintiffs for civil conversion or shoplifting instead of proceeding under the dishonored instruments statute, the $15.00 limit of Utah Code Ann. § 7–15–1(2) does not apply. However, the firm's own conduct makes clear that it was proceeding under the dishonored instruments statute, for its collection letter, sent to each plaintiff, listed a "service charge" in the amount of $15.00. Richard DeLoney testified in his deposition that this figure was used because it was the specific amount allowed by Utah Code Ann. § 7–15–1(2). Further, to accept DeLoney & Associates' argument would permit holders of dishonored checks to easily avoid the provisions of the dishonored instruments statute. Such a result would undermine the effectiveness of the statute and would be inconsistent with Utah Legislature's intention that dishonored checks be governed by the specific procedures outlined in the statute.

■ Because the excessive fees charged by DeLoney & Associates were neither expressly authorized by the plaintiffs nor permitted by Utah law, they violated § 1692f(1) of the Act. Plaintiffs are entitled to summary judgment on this issue.[7]

### 2. Thirty–Day Validation Period

■ Section 1692g requires a debt collector to inform a debtor of his or her right to dispute the validity of a debt. 15 U.S.C. § 1692g(a). This notice must be provided in the debt collector's initial communication with the debtor, or within five days following the initial communication, and must notify the debtor of the amount of the debt, the creditor to whom the debt is owed, and that unless the validity of the debt is disputed in writing within thirty days, the debt collector will assume that the debt is valid. *Id.* The

6. Plaintiffs' claims under § 1692e are addressed *infra*, Part III.B.3.

7. In support of their contention that the fees charged by defendants violated § 1692f(1), plaintiffs advance the additional argument that the sharing of settlement proceeds by DeLoney & Associates and CheckRite was not "permitted by law" because it violated administrative rules and regulations that govern fee splitting between attorney and client. Because the court finds that

the fees charged by defendants violated § 1692f(1) on other grounds, it does not reach this issue.

The court notes that the parties' discussion of Utah's dishonored instruments statute occurs only in the context of the FDCPA. No party has moved for summary judgment on plaintiffs' ninth cause of action, entitled "Violation of Utah Code Ann. § 7–15–1." Third Amended Complaint, ¶¶ 180–189 (Docket No. 98). Accordingly, the court does not reach this claim.

validation language may not be contradicted or overshadowed by the remainder of the letter containing the validation notice or by language in future communications. *Robinson v. Transworld Systems, Inc.*, 876 F.Supp. 385, 391 (N.D.N.Y.1995) (internal citations omitted). CheckRite included the required validation notice in its first letter to plaintiffs. Likewise, the letter sent by DeLoney & Associates contained a validation notice. Both validation notices provided the information required by the Act; however, the collection letter sent by DeLoney & Associates also stated that "[n]otwithstanding your right to dispute the validity of the debt within this thirty (30) day period, we may not delay in instituting a collection lawsuit, except as otherwise required by the Fair Debt Collection Act." Plaintiffs contend that this additional language violated § 1692g because, according to plaintiffs, that provision prohibits all collection efforts until the thirty-day validation period has passed. Defendants argue that § 1692g simply requires that any ongoing collection efforts cease once a debtor disputes a debt within the thirty-day period. The court agrees with defendants.

Section 1692g contains no express requirement that collection efforts be delayed until the thirty-day period has passed. Instead, the statute states that if the debtor disputes a debt, "the debt collector shall *cease* collection of the debt." 15 U.S.C. § 1692g(b) (emphasis added). To accept plaintiffs' reading of § 1692g would require the court to limit the provision in a manner directly contrary to its clear and unambiguous terms. This the court cannot do, for "absent any 'indication that doing so would frustrate Congress's clear intention or yield patent absurdity, [the court's] obligation is to apply the statute as Congress wrote it.'" *Hubbard v. United States*, 514 U.S. 695, 703, 115 S.Ct. 1754, 1759, 131 L.Ed.2d 779 (1995) (quoting *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 570, 114 S.Ct. 1757, 1778, 128 L.Ed.2d 556 (1994) (Souter, J., dissenting)).

■ Plaintiffs also claim that the collection letter sent by DeLoney & Associates to the Dittys violated § 1692g because the validation notice, which appeared on the reverse side of the letter, was "overshadowed" by language on the letter's front side.[8] Plaintiffs' argument is flawed, however, because it ignores the fact that the letter, dated March 6, 1995, was not the "initial communication" made with the Dittys. Rather, the "initial communication" with the Dittys was CheckRite's January 19, 1995 letter. Section 1692g does not require another debt collector, undertaking collection efforts after a validation notice has been timely sent, to provide additional notice and another thirty-day validation period. More than thirty days passed between the time CheckRite sent its initial letter and the time DeLoney & Associates sent its letter. Therefore, the Dittys' right to dispute the validity of the debt expired before the DeLoney & Associates letter was sent. The validation language contained therein was gratuitous and did not violate § 1692g.

Accordingly, defendants are granted summary judgment on plaintiffs' claims based on § 1692g.

### 3. *Threats and Misleading Representations*

■ Plaintiffs claim that defendants' use of the "covenant not to sue" practice violated various provisions of § 1692e which make unlawful the use of deceptive practices in the collection of debts. By representing that they were seeking funds as a "covenant not to sue" or "settlement offer," argue plaintiffs, defendants misrepresented the amounts they were lawfully permitted to collect under the dishonored instruments statute. Defendants contend that all they conveyed to plaintiffs were offers to settle legal disputes and that public policy favors the resolution of legal disputes short of actual litigation.

■ The court analyzes the challenged statements under the "least sophisticated consumer" standard. This standard "ensure[s] that the FDCPA protects all consumers, the gullible as well as the shrewd." *Clomon v. Jackson*, 988 F.2d 1314, 1318 (2d Cir.1993). Additionally, the least sophisticated consumer standard is the most widely accepted test used to determine whether a collection letter violates § 1692e. *Id.* (listing

---

8. The letters sent to the other plaintiffs displayed the validation notice on the front side.

federal district and circuit courts that have adopted the standard).

The collection letters sent by CheckRite did not contain any false, misleading, or deceptive statements in violation of § 1692e. They simply informed the debtor of the amount due, listed a $15.00 service fee, and advised the debtor that he or she may incur additional liability in the form of attorney fees and court costs if CheckRite referred the dishonored check to outside counsel for litigation. The letter also estimated the debtor's potential liability.

The letters sent by DeLoney & Associates were not equally benign. Each letter purported to make a settlement offer comprised of the face amount of the check, a $15.00 service charge, and a figure listed as "Legal Consideration for Covenant Not to Sue." The letters failed to advise debtors that the dishonored instruments statute prohibited the collection of any amount greater than the face amount of the check, plus a $15.00 service fee, unless a lawsuit was filed. Given this omission and defendants' efforts to collect excessive fees under the guise of a covenant not to sue, the court finds that no reasonable juror could conclude that defendants' mailings did not falsely represent the amounts defendants could lawfully collect, in violation of §§ 1692e(2)(A) & (10).

The letter sent by DeLoney & Associates to the Dittys differed slightly from that sent to the other plaintiffs and must be considered separately. The letter warned the Dittys not only of the possibility of a civil action for the amount of the check but that "[o]ther actions, including fraud in the inducement, negligent misrepresentation, civil shoplifting, or theft by check may also be considered." [9] Plaintiffs claim that these statements violated § 1692e(5) because each constituted a "threat to take [an] action that cannot legally be taken or that is not intended to be taken".

At the time DeLoney & Associates sent the letter to the Dittys, the firm had never prosecuted a claim for civil shoplifting or theft by check. However, Richard DeLoney testified in his deposition that at the time the Ditty letter was sent, his research led him to conclude that such actions could be maintained. Mr. DeLoney also testified that after the Ditty letter was sent, actions of this type were filed against certain other debtors.

Defendants maintain that the letter's statement that "other actions ... may be considered" did not threaten legal action, but rather advised the Ditty's, in good faith, of their potential liability. While the letter does not explicitly state that an action will be brought against the Dittys, a reasonable jury applying the least sophisticated consumer standard could conclude that the letter's warning that "other actions ... may be considered" threatened suit. *See United States v. National Financial Services, Inc.*, 98 F.3d 131, 137–38 (4th Cir.1996) (affirming summary judgment for plaintiffs on claim that statements regarding possible legal action violated §§ 1692e(5) & (10), even when creditor did not intend to file suit), *Bentley v. Great Lakes Collection Bureau*, 6 F.3d 60, 62 (2d Cir.1993) (finding statement that creditors "have instructed us to proceed with whatever legal means is necessary" could be interpreted by least sophisticated consumer as threat of imminent suit). Nevertheless, because Richard DeLoney's research led him to conclude that the actions listed in the Ditty letter could be maintained and he did file such actions after mailing the letter, and because Utah law makes the passing of bad checks a criminal offense in some circumstances, the court concludes that there are disputed issues of fact regarding defendants' intent in warning the Dittys of their potential liability. The record also does not permit the court to determine as a matter of law how the least sophisticated consumer would interpret DeLoney & Associates' warning that other actions might be brought against plaintiffs.

Accordingly, because the letters sent to plaintiffs by DeLoney & Associates contained false, misleading, or deceptive statements in violation of § 1692e, plaintiffs are granted summary judgment on this issue. However, factual issues prevent the court from determining whether additional statements contained in DeLoney & Associates' letter to the

9. These causes are not expressly actionable under Utah law. However, knowingly passing a bad check is a criminal offense. Utah Code Ann. § 76–6–505 (1995).

Dittys also violated § 1692e. Letters sent by CheckRite to plaintiffs did not violate § 1692e; thus, CheckRite's motion for summary judgment is granted as to plaintiffs' claim that CheckRite violated § 1692e directly.[10] As discussed more fully *infra,* Part III.D, CheckRite may be held vicariously liable for violations of § 1692e committed by DeLoney & Associates.

### 4. Check Verification System

Plaintiffs allege that by placing plaintiffs' names on CheckRite's check verification system, defendants: (1) made impermissible third party communications in violation of § 1692c(b) of the FDCPA, and (2) reported false information in violation of § 1681e(b) of the FCRA and § 1692e(8) of the FDCPA.[11]

### a. Third Party Communications

 Section 1692c(b) prohibits a debt collector from communicating, "in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector." It is undisputed that CheckRite disseminated information regarding plaintiffs' dishonored checks to its merchant-subscribers via its nationwide verification network. The court concludes that these communications were undertaken, at least in part, "in connection with" CheckRite's efforts to collect on plaintiffs' dishonored checks. Indeed, CheckRite's first collection letter to plaintiffs warned that "[d]ata from *this check* has been entered into our computer. Certain data (in coded form) may be reported to our member merchants and may affect your check cashing privileges. This data will be cleared upon receipt of your prompt payment." (Emphasis added). While CheckRite may have had some legitimate business purpose for making such communications, it is clear that the practice was also designed to

provide CheckRite with additional leverage in collecting the debts created by plaintiffs' dishonored checks. The court also concludes that CheckRite's subscribers were not within the class of third parties to whom such communications may be made under § 1692c(b).

Therefore, whether CheckRite is liable under § 1692c(b) turns on whether CheckRite itself is a "consumer reporting agency" for purposes of its check verification activities. If so, argues CheckRite, § 1692c(b) is not implicated by debt-related communications from CheckRite the "debt collector" to CheckRite the "consumer reporting agency." As discussed more fully *infra,* Part III.C, the record does not permit the court to determine whether CheckRite is or is not a "consumer reporting agency" as a matter of law.

Plaintiffs also argue that DeLoney & Associates is liable under § 1692c(b) for the placement of plaintiffs' names on the check verification system. In support of this contention, plaintiffs rely on the fact that DeLoney & Associates could accept a debtor's partial payment in full satisfaction of the covenant not to sue. Plaintiffs also point to CheckRite's practice of not removing a particular debtor's name from the verification system until being notified by DeLoney & Associates that the debtor's account had settled. The court does not find these facts compelling. The record is clear that CheckRite alone administered the verification system. CheckRite placed names on the system, and CheckRite, in its discretion, removed names from the system. DeLoney & Associates' role was simply to notify CheckRite that a particular account had settled; whether the name associated with that account was actually removed, however, was CheckRite's decision. In addition, even if the notifications given by DeLoney & Associates to CheckRite were considered "communications" for purposes of

---

**10.** In their motions for summary judgment, the parties raise the issue of whether a merchant, Beehive Pizza, d/b/a Dominos Pizza, refused to authorize CheckRite to bring suit on dishonored checks. At oral argument, it appeared that plaintiffs' claim that Beehive had refused to give such authorization resulted from an oversight in the discovery process. Accordingly, the court will not reach this issue.

**11.** Plaintiffs have not alleged that the statement contained in CheckRite's first collection letter that "[c]ertain data (in coded form) may be reported to our member merchants," or the statement contained in DeLoney & Associates' collection letter that upon payment of the settlement amount, "we will notify CheckRite to remove your bank account data from their nation-wide [sic] verification network" violated § 1692e(5).

§ 1692c(b), such communications occurred not "in connection" with the collection of debts, but rather after the debts had been collected.

That DeLoney & Associates incurs no direct liability from the check verification system does not end the inquiry, for if found to be engaged in a joint venture with Check-Rite, the firm may be held liable for unlawful third party communications committed by CheckRite. "Joint venturers stand in the same relationship to each other as partners." *Rogers v. M.O. Bitner Co.*, 738 P.2d 1029, 1034 (Utah 1987) (citing *Kemp v. Murray*, 680 P.2d 758, 759 (Utah 1984)). Thus, principles governing liability among partners apply. *Id.* Utah Code Ann. § 48–1–10 provides:

> Where by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership or with the authority of his copartners loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

Holding DeLoney & Associates liable as CheckRite's joint venturer would require two predicate findings: (1) that CheckRite and DeLoney & Associates were engaged in a joint venture, and (2) that CheckRite violated § 1692c(b) by placing plaintiffs' names on its verification system. However, as discussed more fully *supra*, Part III.B.4.a, and *infra*, Parts III.C & III.D.1, factual issues preclude making either finding at the summary judgment stage.

Accordingly, because the court cannot determine, as a matter of law, whether Check-Rite was a "consumer reporting agency" or whether DeLoney & Associates is liable for any alleged violations of § 1692c(b), summary judgment is denied on this issue.

### b. *False Information*

■ Section 1692e(8) prohibits "[c]ommunicating or threatening to communicate to any person credit information which is known or which should be known to be false[.]" Plaintiffs allege that defendants violated this provision by failing to disclose to subscribers of CheckRite's verification system that defendants had demanded from plaintiffs a fee,

in the form of a covenant not to sue, that exceeded the amount defendants were authorized to collect under Utah law. CheckRite argues that plaintiffs have not shown that any false information was disclosed. DeLoney & Associates maintains that it played no role in the administration of the verification system. The court finds that summary judgment is inappropriate on this issue because neither plaintiffs nor defendants have presented any admissible evidence regarding the substance of the communications allegedly made to CheckRite's subscribers. Without knowing what "credit information," if any, was communicated to the subscribers, the court cannot determine whether such communications were known or should have been known to be false, in violation of § 1692e(8).

Accordingly, summary judgment is denied on this issue.

### C. FCRA Claims

■ FCRA liability attaches to "consumer reporting agencies" in their preparation and dissemination of "consumer reports" and to certain "users" of such reports. *DiGianni v. Stern's*, 26 F.3d 346, 348 (2d Cir.), *cert. denied*, 513 U.S. 897, 115 S.Ct. 252, 130 L.Ed.2d 173 (1994). Plaintiffs contend that defendants are "consumer reporting agencies" subject to the FCRA's regulations and obligations. As used in the FCRA, a "consumer reporting agency" is:

> any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

15 U.S.C. § 1681a(f). "[T]he term refers to firms that are in the business of assembling and evaluating consumer credit information[,] '... a function which involves more than receipt and retransmission of information identifying a particular debt.'" *Id.* at 349 (quoting *D'Angelo v. Wilmington Medical Ctr., Inc.*, 515 F.Supp. 1250, 1253 (D.Del. 1981)).

■ The little evidence in the record regarding CheckRite's verification activities does not reveal whether CheckRite acted merely as a conduit for debt-related information or as something more. The parties' unsupported allegations that CheckRite was or was not a consumer reporting agency are not sufficient to meet their respective burdens on summary judgment.

■ The record does reveal, however, that DeLoney & Associates was not a "consumer reporting agency" under the FCRA. There is no evidence that the law firm was in the business of assembling or evaluating consumer credit information. Rather, the record indicates that the firm simply notified CheckRite that a particular account had been settled. Merely furnishing information about a particular debt does not draw DeLoney & Associates within the definition of a "consumer reporting agency" *Id.* at 348–49; *Rush v. Macy's New York Inc.*, 775 F.2d 1554, 1557 (11th Cir.1985); *D'Angelo*, 515 F.Supp. at 1253.

Because the record at this stage does not permit the court to determine, as a matter of law, whether CheckRite was a "consumer reporting agency," the court denies CheckRite's and plaintiffs' motions as they pertain to plaintiffs' FCRA claims. Because DeLoney & Associates was not a "consumer reporting agency" as defined by the FCRA, its motion for summary judgment is granted as to plaintiffs' FCRA claims.

**D. CheckRite's Vicarious Liability**

■ While the FDCPA itself is silent on the issue of vicarious liability, a debt collector may be held vicariously liable under the Act for the conduct of its attorney. *Newman v. Checkrite California, Inc.*, 912 F.Supp. 1354, 1370 (E.D.Cal.1995) (citing *Fox v. Citicorp Credit Servs., Inc.*, 15 F.3d 1507, 1516 (9th Cir.1994)); *see also Martinez v. Albuquerque Collection Servs.*, 867 F.Supp. 1495, 1502 (D.N.M.1994); *Kimber v. Federal Financial Corp.*, 668 F.Supp. 1480, 1486 (M.D.Ala. 1987); 17 Am.Jur.2d, Consumer Protection § 200 (1990). Plaintiffs advance two theories for finding CheckRite vicariously liable for the collection practices of DeLoney and his law firm: (1) that CheckRite is liable as a joint venturer of DeLoney and DeLoney & Associates, and (2) that CheckRite is liable as

the principal of its agents DeLoney and De-Loney & Associates.

*1. Joint Venture*

■ In Utah, a joint venture "is an agreement between two or more persons ordinarily but not necessarily limited to a single transaction for the purpose of making a profit." *Bassett v. Baker*, 530 P.2d 1, 2 (Utah 1974). The joint venture relationship need not be created by a formal agreement and may be proved by the parties' conduct. *Rogers*, 738 P.2d at 1032.

The requirements for the relationship are not exactly defined, but certain elements are essential: The parties must combine their property, money, effects, skill, labor and knowledge. As a general rule, there must be a community of interest in the performance of the common purpose, a joint proprietary interest in the subject matter, a mutual right to control, a right to share in the profits, and unless there is an agreement to the contrary, a duty to share in any losses which may be sustained.

*Id.* Whether a joint venture exists "depends primarily upon the facts of a particular case rather than upon adherence to specific formalities." *Strand v. Cranney*, 607 P.2d 295, 296 (Utah 1980), and is a question of fact. *Rogers*, 738 P.2d at 1032. Here, the record does not clearly reveal the nature of the relationship between CheckRite and DeLoney & Associates; therefore, the court cannot determine, as a matter of law, whether they were engaged in a joint venture.

*2. Principal/Agent*

■ It is well established that the attorney-client relationship is one between an agent and his or her principal. *McCarthy v. Recordex Service, Inc.*, 80 F.3d 842, 852 (3d Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 86, 136 L.Ed.2d 42 (1996); *see also United States v. 7108 West Grand Avenue*, 15 F.3d 632, 634 (7th Cir.), *cert. denied*, 512 U.S. 1212, 114 S.Ct. 2691, 129 L.Ed.2d 822 (1994) ("[t]he clients are principals, the attorney is an agent, and under the law of agency the principal is bound by his chosen agent's deeds"); *Von Hake v. Thomas*, 858 P.2d 193, 195 n. 3 (Utah App.1993) (attorney is agent

of client); Restatement (Second) of Agency § 1 cmt. e (1958) ("the attorney-at-law ... and other similar persons employed either for a single transaction or for a series of transactions, are agents"). Whether a principal is responsible for the actions of an agent, however, turns on whether the agent acted with either actual or apparent authority. *Zions First National Bank v. Clark Clinic Corporation,* 762 P.2d 1090, 1094 (Utah 1988); *see also Jaeger v. Western Rivers Fly Fisher,* 855 F.Supp. 1217, 1220 (D.Utah 1994). Plaintiffs contend that DeLoney and DeLoney & Associates acted with both actual and apparent authority.

 To impose liability under a theory of actual authority, plaintiffs must demonstrate that CheckRite consented to the manner in which its attorney-agent collected the debts owed by plaintiffs. *Newman,* 912 F.Supp. at 1370 (citing Restatement (Second) of Agency § 7 (1958)). Actual authority can be either express or implied. *Zions First National Bank,* 762 P.2d at 1094.

> Express authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf. Implied authority, on the other hand, embraces authority to do those acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent.... This authority may be implied from the words and conduct of the parties and the facts and circumstances attending the transaction in question.

*Id.* at 1094–95. Here, while the record indicates that CheckRite was well aware of the collection methods utilized by DeLoney and his law firm, there is no evidence that CheckRite expressly authorized DeLoney or DeLoney & Associates to utilize the "covenant not to sue" scheme. Thus, no express actual authority existed.

There was, however, implied actual authority. DeLoney & Associates and CheckRite entered into an oral contract which authorized the law firm to collect CheckRite's delinquent accounts. Under the terms of the contract, CheckRite and the firm shared in the proceeds of such collection efforts— CheckRite received the face value of the check plus $20.00, DeLoney & Associates

retained the balance. Further, CheckRite knew of the collection methods employed by DeLoney & Associates. CheckRite's Senior Vice President, Neil Auerbach, testified in his deposition that prior to the commencement of this suit, he had seen collection letters generated by DeLoney & Associates containing the covenant not to sue language. In fact, Mr. Auerbach was aware that all of the attorneys retained by CheckRite for its collection activities, including DeLoney & Associates, utilized the "covenant not to sue" technique in their collection efforts. That CheckRite did not specifically manifest its consent to its attorney's use of the "covenant not to sue" scheme is not controlling, for "[t]he manifestation of the principal may consist of his failure to object to unauthorized conduct." Restatement (Second) of Agency § 26 cmt. d (1958); *see also Lowder v. Holley,* 120 Utah 231, 233 P.2d 350, 354 (1951) (manifestation of consent necessary to bind principal under theory of implied authority "may be proved by evidence of acquiescence with knowledge of the agent's acts" (quotations and citations omitted)). CheckRite authorized DeLoney & Associates to do its collection work and then knowingly stood by while the firm utilized the "covenant not to sue" scheme. By its acquiescence, CheckRite impliedly authorized the collection practices of DeLoney & Associates and thus is liable for any violations of law caused by the firm's use of those practices.

 CheckRite is also liable for its attorney's collection practices under the doctrine of apparent authority. "To be vicariously liable for the acts of [its agent] under a theory of apparent authority, [the principal] must conduct itself in such a way as to clothe its [agent] with apparent authority to perform the [acts] committed and there must be reasonable reliance on that apparent authority on the part of the injured party." *Jackson v. Righter,* 891 P.2d 1387, 1392 (Utah 1995). CheckRite effectively "clothed" DeLoney & Associates with apparent authority to collect dishonored checks using the "covenant not to sue" scheme. The record indicates that CheckRite knowingly permitted DeLoney and his firm to employ the "covenant not to sue" practice in collecting dishonored checks on CheckRite's behalf. In addi-

tion, CheckRite manifested its consent to the collection practices of DeLoney and DeLoney & Associates. The second collection letter sent by CheckRite to each plaintiff warned that "it is [CheckRite's] practice to refer checks that remain unpaid to outside counsel for litigation" and listed "Attorney Fees and Court Costs," typically in the amount of $200.00, under the heading "POTENTIAL LIABILITY UNDER STATE LAW IF TOTAL DUE IS NOT PAID." On the heels of this letter, plaintiffs received a letter from DeLoney & Associates informing them that their dishonored checks had been referred to the firm by CheckRite. This letter also advised each plaintiff that the firm had CheckRite's authority to settle the matter in exchange for a covenant not to sue. While the acts and representations of DeLoney & Associates were insufficient to create apparent authority on behalf of CheckRite, *see Zions First*, 762 P.2d at 1095, the letters from DeLoney & Associates reinforced CheckRite's manifestation of consent, found in its letters, of the firm's collection practices. In short, "by allowing [DeLoney & Associates] to identify themselves to third parties as representatives of CheckRite, [CheckRite] has made itself responsible for the acts of the attorneys performed in the course of that representation." *Newman*, 912 F.Supp. at 1371. Acting in good faith, plaintiffs reasonably believed that DeLoney & Associates was authorized to collect dishonored checks on behalf of CheckRite using the "covenant not to sue" scheme.

█ In an effort to avoid vicarious liability, CheckRite argues that DeLoney & Associates was an independent contractor rather than an agent. This may be so; however, it does not save CheckRite from liability under principles of agency because the terms "agent" and "independent contractor" are not mutually exclusive. To the contrary,

> most of the persons known as agents, that is, brokers, attorneys, collections agencies, and selling agencies are independent contractors but, although employed to perform services, are not subject to the control or right to control of the principal with respect to their physical conduct in the performance of the services. However, they fall within the category of agents. They are fiduciaries, they owe to the prin-

cipal the basic obligations of agency: loyalty and obedience.

*McCarthy*, 80 F.3d at 853 (quoting Restatement (Second) of Agency § 14N cmt. a (1958)). DeLoney & Associates acted as CheckRite's agent. That the law firm might also have been an independent contractor does not relieve CheckRite of vicarious liability.

Accordingly, because CheckRite vested Richard H. DeLoney and DeLoney & Associates with both implied actual authority and apparent authority, the court finds that CheckRite may be held vicariously liable under the FDCPA for the acts of Mr. DeLoney and his law firm.

### E. Richard H. DeLoney's Personal Liability

Plaintiffs advance two theories for finding Richard DeLoney personally liable for the collection activities of his firm: (1) that DeLoney & Associates was DeLoney's alter ego; and (2) that DeLoney was a "debt collector" under § 1692a(6) of the FDCPA.

#### 1. *Alter Ego*

Limited liability companies are designed to receive special tax treatment and to offer their owners ("members") the type of limited liability enjoyed by shareholders of a corporation. *See* Utah Limited Liability Company Act, Utah Code Ann. §§ 48–2b–101, *et seq.* Just as shareholders are generally insulated from personal liability for the liabilities of a corporation, *Colman v. Colman*, 743 P.2d 782, 786 (Utah App.1987), "neither the members, the managers, nor the employees of a limited liability company are personally liable under a judgment, decree, or order of a court, or in any other manner, for a debt, obligation, or liability of the limited liability company." Utah Code Ann. § 48–2b–109(1). In limited situations, however, Utah courts will look beyond the corporate form to find shareholders individually liable. *Colman*, 743 P.2d at 786. While there is little case law discussing veil piercing theories outside the corporate context, most commentators assume that the doctrine applies to limited liability companies. *See* Karin Schwindt, Comment, *Limited Liability Companies: Is-*

sues in *Member Liability*, 44 UCLA L.Rev. 1541 (1997); Robert B. Thompson, *The Limits of Liability in the New Limited Liability Entities*, 32 Wake Forest L.Rev. 1 (1997); Rachel Maizes, *Limited Liability Companies: A Critique*, 70 St. John's L.Rev. 575 (1996); Eric Fox, Note, *Piercing the Veil of Limited Liability Companies*, 62 Geo. Wash. L.Rev. 1143 (1994); Wayne M. Gazur & Neil M. Goff, *Assessing the Limited Liability Company*, 41 Case W. Res. L.Rev. 387, 403 (1991); Robert R. Keatinge, et al. *The Limited Liability Company: A Study of the Emerging Entity*, 47 Bus. Law. 375, 445 (1992); Curtis J. Braukmann, Comment, *Limited Liability Companies*, 39 Kan. L.Rev. 967, 992 (1991); and Joseph P. Fonfara & Core, R. McCool, Comment, *The Wyoming Limited Liability Company: A Viable Alternative to the § Corporation and the Limited Partnership* 23 Land & Water L.Rev. 523, 525 n. 12 (1988); *see also* Robert G. Lang, Note, *Utah's Limited Liability Company Act: Viable Alternative or Trap for the Unwary*, 1993 Utah L.Rev. 941,966 (1993) (veil piercing doctrine likely to apply to Utah limited liability companies).

▬ To pierce the corporate veil under the alter ego doctrine, it must be shown that:

> (1) [there is] such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter ego of one or a few individuals; and (2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity.

*Colman*, 743 P.2d at 786. Significant factors in determining whether this test has been met include: undercapitalization of a close corporation; failure to observe corporate formalities; siphoning of corporate funds by the dominant shareholder; nonfunctioning of other officers or directors; and the use of the corporation as a facade for operations of the dominant shareholder. *Id.*

▬ Plaintiffs have not produced evidence sufficient to permit a finding, as a matter of law, that the protective veil of DeLoney & Associates should be pierced to hold Richard DeLoney personally liable for the firm's unlawful collection practices. Citing portions of Mr. DeLoney's deposition,

plaintiffs argue that the court should pierce the protective veil of DeLoney & Associates because DeLoney was the sole attorney, "sole shareholder, sole director and president of DeLoney and Associates [sic]," Plaintiffs' Memorandum in Support of Motion for Summary Judgment, at 49 (Docket No. 140), and because he designed the "covenant not to sue" scheme, trained the firm's employees, and supervised the firm's collection practices. The court disagrees. That DeLoney played an active role in the firm's business is, at best, only marginally probative of the factors considered when determining whether to pierce the corporate veil. Further, there is no evidence that DeLoney & Associates was improperly organized under the Utah Limited Liability Company Act.

### 2. "Debt Collector"

▬ Liability under the FDCPA attaches only to a "debt collector," a term defined by the Act as:

> any person who uses any, instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another.

15 U.S.C. § 1692a(6). Attorneys who regularly engage in consumer debt collection activities are included in this definition. *Heintz v. Jenkins*, 514 U.S. 291, 299, 115 S.Ct. 1489, 1493, 131 L.Ed.2d 395 (1995); *see also Fox v. Citicorp Credit Services, Inc.*, 15 F.3d 1507, 1513 (9th Cir.1994) (attorney is "debt collector" if regularly engaged in collection of consumer debts); *Crossley v. Lieberman*, 868 F.2d 566, 570 (3d Cir.1989) (same). Both DeLoney & Associates and Richard DeLoney were "debt collectors" under the FDCPA. Between July 1994 and May 1995, CheckRite referred to DeLoney & Associates more than nine thousand dishonored checks written by Utah residents, and collection work performed for CheckRite accounted for one-third to one-half of the firm's income. Further, as the firm's sole attorney, developer of the "covenant not to sue" practice, author of the generic letters utilized by the firm, and supervisor of all of the firm's

collection activities, Mr. DeLoney was regularly engaged, directly and indirectly, in the collection of debts. Thus, he may be held personally liable under the FDCPA. *See Blakemore v. Pekay*, 895 F.Supp. 972, 977 (N.D.Ill.1995) (liability under FDCPA attaches to individual attorney and law firm where both met Act's definition of "debt collector"); *Teng v. Metropolitan Retail Recovery Inc.*, 851 F.Supp. 61, (E.D.N.Y.1994) (employee of "debt collector" liable under FDCPA if he or she is a "debt collector" within the statutory definition).

Mr. DeLoney maintains that simply satisfying the definition of a "debt collector" does not trigger personal liability under the FDCPA. Rather, argues Mr. DeLoney, personal liability attaches only if the court may also pierce the protective veil afforded DeLoney & Associates under Utah law. *See* Utah Code Ann. § 48–2b–109(1). The little case law cited by Mr. DeLoney does not support his argument. In *West v. Costen*, 558 F.Supp. 564 (W.D.Va.1983), the court determined that the defendant, the president and majority shareholder of a collection agency, was a "debt collector" under the FDCPA. *Id.* at 585. However, because the plaintiffs made no allegation and presented no evidence that the defendant's own conduct violated the FDCPA, the court concluded that he could not be held personally liable under the Act unless the facts warranted disregarding the agency's corporate form. *Id.* The case stands for the well-established proposition that absent personal involvement with an employee's wrongful conduct, a corporate officer cannot be held personally liable for the employee's conduct unless the facts justify piercing the corporate veil. *Id. United States v. ACB Sales & Service, Inc.*, 590 F.Supp. 561 (D.Ariz.1984), also relied upon by Mr. DeLoney, simply restates the principle articulated in West: "Generally, a corporate [director or officer] will not be held vicariously liable, merely by virtue of his office, for the torts of his corporation[; instead] [p]ersonal liability must be founded upon specific acts by the individual director or officer." *Id.* at 573 (internal quotations

and citations omitted). Here, the record reveals that Mr. DeLoney was intimately involved with the unlawful collection practices of his firm. Therefore, West and ACB Sales are not on point.

■ Mr. DeLoney also maintains that even if he is a "debt collector" under the FDCPA, because he is an officer and director of a corporation,[12] he may be held personally liable only for tortious acts, not statutory violations. Simply sending settlement offers to plaintiffs, argues DeLoney, is not tortious conduct. The court finds Mr. DeLoney's argument unpersuasive for two reasons. First, the single case cited by Mr. DeLoney in support of his argument, *Teng, supra,* explicitly undermines his position. In *Teng,* the court discussed the various grounds for holding the defendants, corporate officers of a "debt collector," personally liable for their unlawful debt collection practices. Rather than requiring the defendants to be both "debt collectors" under the FDCPA and tortfeasors, the court determined that the defendants:

> [were] liable on several grounds. First, each [defendant was] himself a 'debt collector' within the statutory definition.... Second, [the defendants were] each affirmative tortfeasors, who actually made the actionable [acts], and would be personally liable if this was a tortious cause of action.

*Id.* at 67. While it is generally true that a corporate officer or director may be held personally liable only for his or her tortious conduct, *Teng* makes clear that when that officer or director is also a "debt collector," he or she may be held personally liable for violations of the FDCPA. Second, Mr. DeLoney mischaracterizes the nature of his conduct: He is being sued not simply for "sending out settlement offers," but rather for sending out *misleading and threatening* settlement offers, conduct likely actionable under common law tort theories of misrepresentation and intentional infliction of emotional distress, if not others. Thus, even it were correct that Mr. DeLoney could be held

12. The court again notes that during the relevant period, DeLoney & Associates was a limited liability company organized under Utah law, not a professional corporation. For purposes of this analysis, however, the court assumes that Mr. DeLoney's argument applies with equal force to managers of a limited liability company.

personally liable only for FDCPA violations that are tortious in nature, individual liability would still attach.

Accordingly, because the court finds that Mr. DeLoney may be held personally liable under the FDCPA as a "debt collector," plaintiffs' are granted summary judgment on this issue. Summary judgment is denied on the issue of whether Mr. DeLoney may incur personal liability under a veil piercing theory.

### F. Injunctive Relief

▪ Plaintiffs ask the court to enjoin CheckRite from disclosing plaintiffs' names, and those of other consumers, on Check-Rite's nationwide check verification system. In response, ·CheckRite argues that injunctive relief is not available for a private litigant under either the FDCPA· or the FCRA. Plaintiffs neither oppose CheckRite's argument nor provide legal authority in support of their request for injunctive relief. Because it appears that injunctive relief is not available to plaintiffs, CheckRite is granted summary judgment on this issue. *See Sibley v. Fulton DeKalb Collection Serv.,* 677 F.2d 830, 834 (11th Cir.1982) (injunctive relief not available to individual under civil liability section of FDCPA); *Mangio v. Equifax, Inc.,* 887 F.Supp. 283, 284–85 (S.D.Fla.1995) (private individuals may not sue for injunctive relief under FCRA).

### G. FDCPA Claims of Plaintiffs Crandall & Robison

▪ The FDCPA covers debts arising from transactions entered into "primarily for personal, family, or household purposes." .15 U.S.C. § 1692a(5). *See Mabe v. G.C. Services Limited Partnership,* 32 F.3d 86, 88 (4th Cir.1994) (FDCPA covers only "debts" incurred to receive consumer goods or services); *Bloom v. I.C. System, Inc.,* 972 F.2d 1067, 1069 (9th Cir.1992)· (FDCPA covers "debts"· arising out of consumer, not commercial, activities). CheckRite seeks summary judgment on three of the four claims asserted by Mark Crandall on .the ground that the dishonored checks underlying these claims did not arise from "consumer" transactions, but instead were issued by Crandall in connection with his painting business. Plaintiffs oppose the motion simply by arguing that Crandall's fourth claim, predicated on a dis-

honored check written to purchase food for his family, arises out a consumer transaction and is within the Act's coverage. Because CheckRite's contentions appear to have merit, CheckRite is granted summary judgment on those of Crandall's claims not founded on consumer transactions.

CheckRite also seeks summary judgment on the Robisons' claims on the ground that these claims are time-barred by the Act's one-year statute of limitations. In support of its motion, CheckRite points to Barry Robison's deposition testimony that he and his wife were last contacted by defendants in November 1993. In response, plaintiffs argue that the statute of limitations was tolled because CheckRite and DeLoney & Associates concealed their conduct through various violations of the Utah's dishonored instruments statute. The court finds that summary judgment is not appropriate because neither the record nor the parties' memoranda adequately address the limitations issue. Accordingly, CheckRite's motion for summary judgment on the Robisons' claims is denied with leave, should the parties choose, to supplement the record and file another motion for summary judgment addressing those claims.

### IV. CONCLUSION

To summarize, the court finds as follows:

(1) A dishonored check constitutes a "debt" under the FDCPA, and the Act's coverage extends to abusive check collection practices;

(2) DeLoney & Associates attempted to collect excessive fees in violation of FDCPA § 1692f($l$ );

(3) Defendants did not violate plaintiffs' debt validation rights under FDCPA § 1692g;

(4) Collection letters sent to plaintiffs by CheckRite did not contain false, misleading, or deceptive statements in violation of FDCPA § 1692e;

(5) The collection letter sent to plaintiffs by DeLoney & Associates contained false, misleading, or deceptive statements in violation of FDCPA § 1692e;

(6) Factual issues prevent the court from determining, as a matter of law, whether warnings of possible legal action contained in DeLoney & Associates' letter to the Ditty plaintiffs violated § 1692e(5);

(7) Factual issues prevent the court from determining, as a matter of law, whether CheckRite made third party communications in violation of FDCPA § 1692c(b);

(8) DeLoney & Associates did not itself make third party communications in violation of FDCPA § 1692c(b); however, the firm may be held liable for unlawful third party communications by CheckRite if found to be CheckRite's joint venturer;

(9) Factual issues prevent the court from determining, as a matter of law, whether defendants communicated false information in violation of FDCPA § 1692e( 8).

(10) Factual issues prevent the court from determining whether CheckRite was a "consumer reporting agency" subject to the FCRA;

(11) DeLoney & Associates was not a "consumer reporting agency" and thus is not subject to liability under the FCRA;

(12) Factual issues prevent the court from determining, as a matter of law, that CheckRite and DeLoney & Associates were engaged in a joint venture;

(13) Under theories of implied actual authority and apparent authority, CheckRite may be held vicariously liable under the FDCPA for the abusive debt collection practices of DeLoney & Associates;

(14) Factual issues prevent the court from determining, as a matter of law, whether it may pierce the veil of DeLoney & Associates, L.L.C. to hold Richard H. DeLoney personally liable for the firm's abusive debt collection practices;

(15) Richard H. DeLoney was a "debt collector" as defined by the FDCPA and may be held personally liable for his violations of the Act;

(16) Plaintiffs are not entitled to injunctive relief under either the FDCPA or the FCRA;

(17) Plaintiff Crandall's claims not based on debts arising from consumer transactions are not cognizable under the FDCPA;

(18) Factual issues prevent the court from determining, as a matter of law, whether the FDCPA claims asserted by the Robinson plaintiffs are time-barred.

Accordingly, as set forth above and for the reasons stated, the parties' motions for summary judgment are hereby GRANTED in part and DENIED in part.